PUBLISH

UNITED STATES COURT OF APPEALS

**Filed 4/3/96**                    TENK CIRCUIT

UNITED STATES OF AMERICA,                )
                                         )
    Appellant,                           )
                                         )
vs.                                      )
                                         )       No. 95-4071
                                         )
MURDOCK MACHINE AND                      )
ENGINEERING COMPANY OF UTAH,             )
LOGAN A. BAGLEY, Trustee for Murdock     )
Machine and Engineering Company of Utah, )
                                         )
    Appellees.                           )

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 93-C-0918-S)

Richard P. Nockett, Attorney, Civil Division, Commercial Litigation Branch, United States Department of Justice, Washington, D.C., for Appellant.

Robert H. Koehler, of Patton Boggs, L.L.P., Washington, D.C. (James B. Lee, Craig B. Terry, E. Russell Vetter, of Parsons, Behle & Latimer, Salt Lake City, Utah, with him on the brief), for Appellee.

Before BALDOCK, McWILLIAMS, and KELLY, Circuit Judges.

BALDOCK, Circuit Judge.

       Cases governed by the Bankruptcy Act of 1898, 11 U.S.C. §§ 1-1103 (1976)

(repealed) ("the Act") and the former Bankruptcy Rules, 11 U.S.C. appx. (1976)

(superseded in 1983), are, like cowboys, a vanishing breed.  We deliver in this case one of the final parting shots under the Act and former Rules.[1]  We hold that in proceedings under Chapter VII of the Act, the United States government enjoys sovereign immunity from the automatic stays imposed by former Rules 401 and 601 because Congress did not waive the government's sovereign immunity in the Act.  Accordingly, we reverse the decision of the district court and remand.

## I.  Background

### A.  Contract Awards & Terminations

In June 1971, the government awarded Murdock Machine and Engineering Company of Utah ("Murdock") a multi-year, $10.6 million, fixed-price contract to supply antisubmarine rocket launchers ("ASROC launchers") to the Department of the Navy ("the ASROC contract").  Murdock did not timely produce the ASROC launchers,

---

[1] The Bankruptcy Act of 1898 applies to the instant case because Murdock filed its Chapter VII petition in 1975, prior to the effective date of the current Bankruptcy Code.  United States v. Bagley (In re Murdock Mach. & Eng'g Co.), 990 F.2d 567, 569 n.1 (10th Cir. 1993); see also Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, § 403(a), 92 Stat. 2549, 2683 (providing that prior law and procedures apply to cases initiated before October 1, 1979).  By an April 25, 1983 Order, 11 U.S.C. Index, XIII, the Supreme Court provided that the current Bankruptcy Rules would take effect and supersede the former Rules on August 1, 1983 and that the current Rules "shall be applicable to proceedings then pending, except to the extent . . . their application . . . would not be feasible or would work injustice, in which event the former procedure applies."  We apply Former Bankruptcy Rules 401 and 601 in the instant case because they supplied the automatic stays which the government allegedly violated.  Hence, they are the Rules pertinent to the instant case.  Unless otherwise noted, references hereinafter will be to the Bankruptcy Act of 1898 ("the Act") and to the former Rules of Bankruptcy Procedure ("Rule ___").

however, due to financial and production problems. Concerned with the production delay, the Navy Procuring Command ("NPC") and Naval Sea Systems Command ("NAVSEA") met with Murdock, and agreed to provide Murdock a $2.5 million government-guaranteed loan from the Commercial Security Bank of Ogden, Utah ("Murdock's Bank"). NAVSEA also assured Murdock that it could apply for additional financial assistance under the extraordinary contractual relief provisions of Public Law No. 85-804, 50 U.S.C. §§ 1431-36 ("P.L. 85-804") if the $2.5 million guaranteed loan proved to be insufficient. See 50 U.S.C. §§ 1431-36 (granting agency head authority to provide extraordinary relief to a contractor when a contract is deemed essential to the national defense).

The government then awarded Murdock five additional fixed-price contracts--the contracts at issue in this appeal--including an: (1) Army contract for supply of Rocket fin and nozzle assemblies; (2) Army contract for construction of delay plungers; (3) Air Force contract for construction of practice bombs; (4) Navy contract for construction of Zuni launchers; and (5) Navy contract for construction of A/B dispensers (hereinafter collectively referred to as "the Non-ASROC contracts"). Each contract contained a standard "default" clause and "disputes" clause. See 48 C.F.R. §§ 52,249-8, 52,249-2. The default clause provided that if the government's default termination was proper, the government could recover from the contractor its excess costs of reprocurement, unliquidated progress payments, and other damages. The default clause provided further,

3

however, that if the government's default termination was improper, (e.g., if the contractor's default was excusable because it was beyond its control), the government would not be entitled to recover the above and, in turn, the government could potentially be liable to the contractor under the "termination for convenience" clauses of the Non-ASROC contracts.[2]  The disputes clause provided that:

> (A) Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer. . . . The decision of the Contracting Officer shall be final and conclusive unless, within thirty days from the date of receipt of such copy, the Contractor mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the Secretary [or his duly authorized representative--the Armed Services Board of Contract Appeals ("ASBCA")].

With the funds from the guaranteed loan, Murdock continued performance on the ASROC contract and began performance on the Non-ASROC contracts.  Murdock again encountered financial and production problems, and in August 1974 submitted a Request for Extraordinary Contractual Relief under P.L. 85-804.  In its Request, Murdock explained that its total probable completion costs for the ASROC contract would be $20 million and asked the Navy to convert the $10.6 million fixed-price ASROC contract into

---

[2]  Under the standard termination for convenience clauses of government contracts, convenience terminations permit the contractor to claim its incurred and allowed costs from the government, against which the government recoups its contract financing (loans and progress payments).  See Dewey Elec. Corp., ASBCA No. 33,869, 91-1 BCA ¶ 23,433 (1990).

4

a cost-reimbursement contract with a $22 million ceiling.[3]  NAVSEA recommended that

the Navy Contract Adjustment Board ("NCAB") grant Murdock P.L. 85-804 relief.[4]  In

April 1975, NCAB granted Murdock P.L. 85-804 relief and converted the ASROC

contract to a cost-reimbursement contract with a $22 million ceiling.

Thereafter, NAVSEA learned that it could obtain ASROC launchers from another

source.  NAVSEA immediately informed Murdock and NCAB that it was withdrawing its

recommendation for P.L. 85-804 relief.  The Navy then informed Murdock that it would

not convert the ASROC contract to a cost-reimbursement contract and that Murdock had

ten days to cure its delinquent ASROC delivery schedule or face default termination.

Murdock apparently did not cure, and on May 16, 1975, a Navy contract officer

terminated the ASROC contract for default.  The Navy authorized Murdock's bank to call

the guaranteed loan, and cut off progress payments to Murdock.

Seven days after the Navy terminated the ASROC contract, on May 23, 1975,

Murdock filed a voluntary petition for relief under Chapter VII of the Act in the District

---

[3]  Under a fixed-price contract, the contractor cannot bill the government for additional costs.  In contrast, under a cost-reimbursement contract, the contractor can bill the government for additional production costs, subject to the ceiling imposed.

[4]  The NCAB is an administrative board designated by the Secretary of the Navy to rule on P.L. 85-804 requests.

of Utah.[5]  By operation of law, the automatic stay provisions of Rules 401(a) and 601(a) immediately went into effect.  See Bankruptcy Rules 401(a), 601(a) ("The filing of a petition shall operate as a stay.").  After the bankruptcy court adjudicated Murdock a bankrupt, but prior to the running of the sixty-day period allowed under § 70(b) of the Act for the Trustee to assume or reject executory contracts, the Army, Air Force, and Navy unilaterally terminated the Non-ASROC contracts for default.  See Bankruptcy Act of 1898, § 70(b) ("The trustee shall assume or reject an executory contract . . . within sixty days after the adjudication.").  Murdock timely appealed the Navy's default termination of the ASROC contract to the ASBCA.  Murdock did not, however, appeal the government's terminations of the Non-ASROC contracts to the ASBCA.

While Murdock's appeal of the Navy's default termination of the ASROC contract was pending before the ASBCA, between September and November 1975, the government filed proofs of claim against Murdock's bankruptcy estate.  Claim 559A sought $3,865,673.65 for unliquidated progress payments and excess reprocurement costs under the Non-ASROC contracts.  Claim 764A sought $7,933,291.71 for unliquidated

---

[5]  Approximately one month later, on June 26, 1975, Murdock filed a Chapter X reorganization petition.  Murdock's Chapter X petition pended for fifteen days, but was never approved by the bankruptcy court.  On July 11, 1975, Murdock filed a petition under Chapter XI of the Act, superseding its Chapter X petition.  On August 7, the bankruptcy court dismissed the Chapter XI petition at Murdock's request and ordered that the case proceed "pursuant to the Bankruptcy Petition filed herein on May 23, 1975"--i.e., Murdock's original Chapter VII petition.  Murdock's bankruptcy is therefore a Chapter VII.

progress payments under the ASROC contract, $1,867,792.27 for unliquidated progress payments and excess reprocurement costs under the Non-ASROC contracts, and $1,927,758 for amounts owing on a government loan, for a total of $11,728,841.98.

The Trustee took no immediate action on the government's proofs of claim. Six years later, in October 1981, the Trustee asserted an $11.6 million claim against the Navy under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-13, alleging that the government breached the ASROC contract. A contracting officer denied the Trustee's claim. The Trustee appealed to the ASBCA.

The ASBCA consolidated the Trustee's appeal of the claim denial with Murdock's appeal of the Navy's May 1975 default termination of the ASROC contract. Following a lengthy trial on the merits, in November 1987, the ASBCA determined that the Navy's default termination of the ASROC contract was proper, and denied the Trustee's breach of contract claim. Murdock Mach. & Eng'g Co., ASBCA No. 20,354, 88-1 BCA ¶ 20,354, at 102,936-37. On appeal, the United States Court of Appeals for the Federal Circuit reversed. Murdock Mach. & Eng'g Co. v. United States, 873 F.2d 1410, 1413 (Fed. Cir. 1989). The Federal Circuit held that the NCAB's April 1975 decision on Murdock's P.L. 85-804 Request was final and converted Murdock's fixed-price ASROC contract into a cost-reimbursement contract. Id. Accordingly, the government was obligated to compensate Murdock for its incurred performance costs. Because the government failed to reimburse Murdock its costs, it materially breached the ASROC

7

contract, and thereby "relieved Murdock of the default termination and its consequences." The Federal Circuit converted Murdock's wrongful default termination into a termination for the convenience of the government. Id.

## B. Bankruptcy Court ASROC Litigation

Based on the Federal Circuit's decision, on July 26, 1990, the Trustee filed an objection to the portion of the government's claim 764A that sought unliquidated progress payments under the ASROC contract and moved for summary judgment. In its motion for summary judgment, the Trustee argued that under the ASROC contract, the government was entitled to progress payments only upon a proper default termination. Because the Federal Circuit held that the government materially breached the ASROC contract, resulting in a termination for convenience of the government (instead of a proper default termination), the Trustee maintained that the portion of the government's claim 764A seeking progress payments under the ASROC contract was invalid.

The bankruptcy court agreed and concluded that the Federal Circuit's decision eliminated the government's legal basis for recovery of progress payments under the ASROC contract. The court granted the Trustee's motion for summary judgment and denied the portion of the government's claim 764A seeking progress payments under the ASROC contract. In re Murdock Mach. & Eng'g Co., 1991 WL 180084 (Bankr. D. Utah, May 1, 1991) (unpublished). The district court affirmed and we affirmed the district court. United States v. Bagley (In re Murdock Mach. & Eng'g Co.), Nos. 91-C-657G, 91-

8

C-658G (D. Utah Dec. 3, 1991), aff'd, 990 F.2d 567 (10th Cir. 1993).

## C. Bankruptcy Court Non-ASROC Litigation

On the same day the Trustee objected to claim 764A, the Trustee filed an adversary proceeding objecting to the government's claim 559A and the portion of claim 764A that sought unliquidated progress payments and excess procurement costs under the Non-ASROC contracts. The Trustee asserted that the government wrongfully terminated the ASROC contract, which rendered Murdock financially unable to perform the Non-ASROC contracts. As a result, the Trustee maintained that Murdock's inability to perform the Non-ASROC contracts was "excusable" within the meaning of the default clauses and therefore, the government wrongfully terminated the Non-ASROC contracts. The Trustee requested the bankruptcy court deny the government's Non-ASROC claims.

The government moved for summary judgment. The government argued that the respective contracting officers properly terminated the Non-ASROC contracts for default. Accordingly, the government argued it was entitled to recover from Murdock unliquidated progress payments and excess costs of reprocurement under the default clauses of the Non-ASROC contracts. Because Murdock failed to timely appeal the terminations of the Non-ASROC contracts to the ASBCA, the government maintained that the terminations were final under the disputes clauses of the contracts. Applying government contract law principles, the government argued Murdock was bound by the final terminations and could not raise defenses to the government's claims in the

9

bankruptcy proceeding.  E.g., Crown Coat Front Co. v. United States, 386 U.S. 503 (1967).

The bankruptcy court denied the government's motion for summary judgment. The court concluded that the contracting officers' post-petition terminations of the Non-ASROC contracts were null and void because they violated the stay provisions of Act § 148 and Rules 401(a) and 601(a).  E.g., Ellis v. Consolidated Diesel Elec. Corp., 894 F.2d 371, 372 (10th Cir. 1990) ("It is well established that any action taken in violation of the stay is void and without effect.").  Because the bankruptcy court determined that the termination decisions were a nullity, it concluded the disputes clauses of the Non-ASROC contracts were inapplicable.  Accordingly, the bankruptcy court held inapposite the government contract law cases that the government alleged bound Murdock to the terminations.

The bankruptcy court then conducted a trial.  Based upon the evidence and testimony, the court concluded that the Navy's wrongful termination of the ASROC contract caused Murdock's bankruptcy, which, in turn, rendered Murdock unable to perform the Non-ASROC contracts.  Concluding that Murdock's default of the Non-ASROC contracts was beyond its control and the fault of the Navy, the court held that Murdock's failure to perform the Non-ASROC contracts was "excusable" under the terms of the contracts' default clauses.  Because Murdock's failure to perform was "excusable," the bankruptcy court concluded that the government wrongfully terminated

10

the Non-ASROC contracts for default. The court converted the default terminations into terminations for the convenience of the government, and disallowed the government's approximately $6 million Non-ASROC claims for unliquidated progress payments and excess costs of reprocurement.

In addition, the bankruptcy court concluded that the government subjected itself to the equitable power of the court to allow or disallow its claims when the government submitted its claims against Murdock's estate. The court bolstered its conclusion that it had jurisdiction to allow or disallow the government's claims by citing Act § 2(a)(2), 11 U.S.C. § 11(a)(2) (1976) (repealed).[6] Finally, the court held that the doctrine of laches did not bar the Trustee's objections to the government's Non-ASROC claims. The district court affirmed and the government appealed.

## II.

The threshold issue presented by this appeal is whether the government violated the automatic stays provided by Rules 401 and 601 when it terminated the Non-ASROC contracts. If the government is not subject to the automatic stays because the Act does not waive the government's sovereign immunity, it necessarily follows that the government did not violate the stays by terminating the contracts. The initial question we must decide, therefore, is whether the government enjoys sovereign immunity from the

---

[6] Specifically, Act § 2(a)(2) grants bankruptcy courts summary jurisdiction to "[a]llow claims, disallow claims, reconsider allowed or disallowed claims, and allow or disallow them against bankrupt estates."

11

automatic stays provided by Rules 401 and 601.

The government argues it is not subject to the automatic stay provisions because the Act does not waive the government's sovereign immunity. Accordingly, the government maintains it did not violate the automatic stays and the bankruptcy court erred by disallowing its proofs of claim for unliquidated progress payments and excess costs of reprocurement under the Non-ASROC contracts.

Murdock argues the government is subject to the automatic stay provisions of Rules 401 and 601 for two reasons. First, Murdock asserts that under Granfinanciera, S.A. v. Nordberg, 492 U.S. 33 (1989), the government waived its sovereign immunity by submitting a claim against Murdock's estate. Second, Murdock contends that § 2(a)(2) of the Act constitutes a waiver of the government's sovereign immunity because it grants the bankruptcy court jurisdiction to allow or disallow creditors' claims. Accordingly, Murdock argues the government's post-petition terminations of the Non-ASROC contracts violated the automatic stay provisions of Rules 401 and 601, and, as a result, the bankruptcy court properly denied the government's Non-ASROC claims.[7] Mindful that

_____

[7] Murdock does not challenge the government's assertion that the stay afforded by Bankruptcy Act § 148 is inapplicable. We agree with the government that § 148 applies exclusively to Chapter X proceedings, and is therefore inapplicable to this Chapter VII case. See 11 U.S.C. § 501 (1976) ("The provisions of this chapter [i.e., Chapter X] shall apply exclusively to proceedings under this chapter.").

Murdock contends anew that the government's post-petition terminations violated Act § 70b. See Bankruptcy Act of 1898, § 70b (granting Trustee sixty days to assume or reject executory contracts). We do not consider this argument because it is raised for the first time on appeal. Farmers Ins. Co. v. Hubbard, 869 F.2d 565, 570 (10th Cir. 1989).

12

we review the bankruptcy court's findings of fact for clear error and its legal conclusions de novo, ABB Vecto Gray, Inc. v. First National Bank (In re Robinson Brothers Drilling, Inc., 9 F.3d 871, 872 (10th Cir. 1993), we turn to the sovereign immunity issue.

A.

"It has long been established . . . that the United States, as sovereign, 'is immune from suit save as it consents to be sued.'" United States v. Testan, 424 U.S. 392, 399 (1976) (quoting United States v. Sherwood, 312 U.S. 584, 586 (1941)). This immunity extends to injunctive relief.[8] Hatahley v. United States, 351 U.S. 173, 176, 182 (1956) (district court had no power to enjoin United States or its agents from destroying horses

---

[8] Effective October 21, 1976, Congress amended § 10(b) of the Administrative Procedure Act, 5 U.S.C. § 702, to provide a general waiver of the government's sovereign immunity from injunctive relief. See 5 U.S.C. §§ 701-02; see also United States v. Mitchell, 463 U.S. 206, 227 n.32 (1983) (Congress generally waived the government's immunity from suit for injunctive relief in § 702); Cabrera v. Martin, 973 F.2d 735, 741 (9th Cir. 1992) ("Section 702 now provides a broad waiver of immunity for injunctive actions filed against the federal government."). Section 702 does not apply to the instant case, however, because the government terminated the Non-ASROC contracts in 1975, before the October 1976 effective date of § 702. Section 702 does not apply retroactively because nothing in the statute or its legislative history suggests that Congress intended the amendment have retroactive effect. See Plaut v. Spendthrift Farm, Inc., 115 S. Ct. 1447, 1461 (1995) ("[S]tatutes do not apply retroactively unless Congress expressly states that they do."); Landgraf v. USI Film Prods., 114 S. Ct. 1483, 1502-04 (1994) (noting the Bradley v. Richmond School Bd., 416 U.S. 696 (1969) line of cases "did not alter the well-settled presumption against" retroactive application of statutes and adhering to rule that Congress must expressly state its intention to have statute operate retroactively). But see Hill v. United States, 571 F.2d 1098, 1102 (9th Cir. 1978) (rejecting rule that statutes do not apply retroactively in the absence of express congressional intent, and relying on Bradley line of cases to hold that 5 U.S.C. § 702 applies retroactively). We express no opinion whether we would reach a different result if § 702 applied.

13

owned by Navaho Indians); Naganab v. Hitchcock, 202 U.S. 473, 475-76 (1906)

(Chippewa Indians could not require Secretary of Interior to administer certain lands for

their benefit); Hill v. United States, 50 U.S. 386, 388-90 (1850) (judgment debtor barred

from enjoining United States from enforcing judgment); see also United States v.

Patterson, 206 F.2d 345, 348 (5th Cir. 1953) ("[I]t is beyond dispute that unless expressly

permitted by an Act of Congress, no injunction can be granted against the United

States."). As the Supreme Court explained in Larson v. Domestic & Foreign Commerce

Corp., 337 U.S. 682 (1949) (superseded in part by 5 U.S.C. § 702):

> [I]t is one thing to provide a method by which a citizen may be
> compensated for a wrong done him by the Government. It is a far different
> matter to permit a court to exercise its compulsive powers to restrain the
> Government from acting, or to compel it to act. There are the strongest
> reasons of public policy for the rule that such relief cannot be had against
> the sovereign. The Government, as representative of the community as a
> whole, cannot be stopped in its tracks by any plaintiff who presents a
> disputed question of property or contract right. As was early recognized,
> "The interference of the Courts with the performance of the ordinary duties
> of the executive departments of the government, would be productive of
> nothing but mischief. . . ."

Id. at 704 (quoting Decatur v. Paulding, 14 Pet. 497, 516 (1840)).

"[T]he existence of consent is a prerequisite for jurisdiction." United States v.

Mitchell, 463 U.S. 206, 212 (1983). Thus, if the government has not consented to suit,

the courts have no jurisdiction to either "restrain the government from acting, or to

compel it to act." Larson, 337 U.S. at 704; see also Price v. United States (In re Price), 42

F.3d 1068, 1071 (7th Cir. 1994) ("[T]he government's waiver of sovereign immunity is a

jurisdictional prerequisite to a bankruptcy court's order."). The policy behind this rule is that the government should not be hampered in its performance of activities essential to the governing of the nation, unless it has given its consent. See Larson, 337 U.S. at 704; see also Commissioners of the State Ins. Fund v. United States, 72 F. Supp. 549, 552 (D.C.N.Y. 1947) (sovereign immunity grounded on the doctrine that "The King can do no wrong.").

The government consents to be sued only when Congress "'unequivocally expresse[s]'" its intention to waive the government's sovereign immunity in the statutory text. United States v. Nordic Village, Inc., 503 U.S. 30, 33, 37 (1992) (quoting Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95 (1990)). If waiver is not unequivocal from the text, the government retains its sovereign immunity. Legislative history cannot supply the necessary unequivocal expression. Id.; see also Department of the Army v. FLRA, 56 F.3d 273, 277 (D.C. Cir. 1995) ("This [unequivocal] expression must appear on the face of the statute; it cannot be discerned in (lest it be concocted out of) legislative history.").

"A waiver of sovereign immunity cannot be implied." Irwin, 498 U.S. at 95 (internal quotations omitted). Thus, Congress does not waive the government's sovereign immunity by granting a court jurisdiction to hear a claim. See Nordic Village, 503 U.S. at 38 (Congress' grant of "exclusive jurisdiction" to district courts in bankruptcy cases "of all of the property . . . of the debtor" in 28 U.S.C. § 1334(d) did not constitute a waiver of

15

the government's sovereign immunity); cf. Blatchford v. Native Village of Noatak, 501 U.S. 775, 786-87 (1991) (Congress's grant of jurisdiction to district courts to hear claims brought by Indian tribes in 28 U.S.C. § 1362 did not constitute an "unequivocal[] expression" by Congress' to abrogate Alaska's Eleventh Amendment immunity).  As the Supreme Court stated in Blatchford, "[t]he fact that Congress grants *jurisdiction* to hear a claim does not suffice to show Congress has abrogated all *defenses* to that claim.  The issues are wholly distinct."  Id. at 787 n.4.

Because waiver must be "unequivocally expressed" by Congress, "[o]fficers of the United States possess no power through their actions to waive an immunity of the United States or to confer jurisdiction on a court."  United States v. New York Rayon Importing Co., 329 U.S. 654, 660 (1947); see Minnesota v. United States, 305 U.S. 382, 388-89 (1939) (United States Attorney could not waive the sovereign immunity of the United States by filing a petition for removal of case to federal court); Carr v. United States, 98 U.S. 433, 438 (1878) (Secretary of Treasury did not waive the sovereign immunity of the United States by employing an attorney to argue the cause of the United States).  The federal government's appearance in court through its officers and agents, therefore, does not waive the government's sovereign immunity.  Carr, 98 U.S. at 438; FLRA, 56 F.3d at 275.  Likewise, officers and agents do not waive the government's sovereign immunity from injunctive relief by instituting an action or asserting a claim in court.  See United States v. Shaw, 309 U.S. 495, 499, 501-03 (1940); United States v. United States Fidelity

16

& Guar. Co., 309 U.S. 506, 510-13 (1940); see also United States v. Associated Air Transport, Inc., 256 F.2d 857, 862 (5th Cir. 1958) ("[T]he United States does not waive its immunity from the imposition upon it of an injunction or other unauthorized remedy by coming into court with a claim or counter-claim."); Patterson, 206 F.2d at 348 ("[I]t is now well settled that the United States does not waive its sovereign immunity by the institution of an action. . . .").

In determining whether the United States is immune from "suit," courts interpret the term "suit" broadly to include more than just an actual suit instituted against the United States. See Shaw, 309 U.S. at 503 ("'The objection to a suit against the United States is fundamental, whether it be in the form of an original action or a set-off or a counterclaim.'") (quoting Nassau Smelting Works v. United States, 266 U.S. 101, 106 (1924)). Indeed, the United States' immunity from "suit" extends not only to all types of injunctive process and relief, e.g., Naganab, 202 U.S. at 475-76, but also to judicial process, Buchanan v. Alexander, 45 U.S. 19, 19-20 (1846) (disbursing agent of government not subject to writ of attachment sought by creditors of seaman serving on the frigate Constitution), and state statutory time-restraints, United States v. Summerlin, 310 U.S. 414, 416 (1940) ("It is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights."); accord United States v. Thompson, 98 U.S. 486, 488-89 (1878); United States v. Hato Rey Bldg. Co., Inc., 886 F.2d 448, 450 (1st Cir. 1989) (noting the "maxim *nullum tempus occurrit*

17

*regi* (time does not run against the King)"). Thus, the term "suit" embodies the broad principle that the government is not subject to "legal proceedings, at law or in equity" or "judicial process" without its consent. Belknap v. Schild, 161 U.S. 10, 16 (1896). Interpreting the term "suit" broadly comports with the core notion of sovereign immunity that in the absence of governmental consent, the courts lack jurisdiction to "restrain the government from acting, or to compel it to act." Larson, 337 U.S. at 704.

B.

The Supreme Court promulgated Rules 401 and 601 pursuant to congressionally delegated authority in 28 U.S.C. § 2075. See 28 U.S.C. § 2075 (granting Supreme Court authority to promulgate bankruptcy rules); In re Williams, 422 F. Supp. 342, 344 (N.D. Ga. 1976) (former bankruptcy rules promulgated by Supreme Court pursuant to 28 U.S.C. § 2075). The rules were designed to correct problems with stays under the Act, including, inter alia, the fact that stays under the Act were not automatic, but required an order of the bankruptcy court. See 2 Collier on Bankruptcy § 362.01(3) (15th ed. 1995). Thus, the Rules provided that the stays would take effect automatically upon the filing of the petition by the bankrupt. Specifically, Rule 401(a) provided that "[t]he filing of a petition shall operate as a stay of the commencement or continuation of any action against the bankrupt, or the enforcement of any judgment against him . . . ." Bankruptcy Rule 401(a), 11 U.S.C. appx. (1976) (superseded). Rule 601(a) provided that "[t]he filing of a petition shall operate as a stay of any act or the commencement or continuation of any court

18

proceedings to enforce (1) a lien against property in the custody of the bankruptcy court . . . ." Bankruptcy Rule 601(a), 11 U.S.C. appx. (1976) (superseded).

By filing a petition for Chapter VII relief under the Act, therefore, a bankrupt triggers the automatic stay provisions of Rules 401 and 601. By triggering the automatic stay provisions of Rules 401 and 601, the bankrupt thereby initiates injunctive process against his creditors and restrains them from taking specified actions. See, e.g., Diversified Mortgage Investors v. LaRose, 7 B.R. 447, 452-53 (Bankr. M.D. La. 1980) (stays imposed by Rules 401 and 601 barred creditor from instituting an action against the bankrupt and from foreclosing against the mortgaged property); First Nat'l Bank of Rocky Mount v. Chitwood, Jr. (In re Chitwood, Jr.), 1 B.R. 415, 416-17 (Bankr. W.D. Va. 1979) (stays imposed by Rules 401 and 601 enjoined creditor from proceeding in county court to obtain judgments against bankrupt); In re Ducich, 385 F. Supp. 1287, 1289 (C.D. Cal. 1974) (stays imposed by Rules 401 and 601 barred employer from withholding bankrupt's earnings). Accordingly, the automatic stays provided by Rules 401 and 601 are tantamount to injunctions imposed by order of the Supreme Court. Moratzka v. VISA USA (In re Calstar, Inc.), 159 B.R. 247, 257 (Bankr. D. Minn. 1993) (stay imposed by former bankruptcy rules was "in effect, an order of the Supreme Court.").

## C.

Applying the above principles of sovereign immunity, the government is immune

19

from injunctive process in the absence of an express waiver by Congress of its sovereign immunity. Testan, 424 U.S. at 399; Larson, 337 U.S. at 703. This means that, in the absence of governmental consent, the bankruptcy court has no jurisdiction to "restrain the government from acting, or to compel it to act." Id. at 704; Mitchell, 463 U.S. at 212. After extensive examination of the statutory text of the Act, we find neither an unequivocal Congressional waiver of the government's sovereign immunity from the automatic stays provided by Rules 401 and 601, nor an unequivocal waiver of the government's immunity from injunctive relief. See McAvoy v. United States, 178 F.2d 353, 356 (2d Cir. 1949) ("We find nothing in the Bankruptcy Act to authorize the granting of an injunction against the United States."); United States v. Mel's Lockers, Inc., 346 F.2d 168, 170 (10th Cir. 1965) (general language in Bankruptcy Act authorizing bankruptcy court to enjoin action by bankrupt's creditors does not waive the sovereign immunity of the United States). Accordingly, we conclude the government's sovereign immunity renders it immune from the automatic stays provided by Rules 401 and 601 of the Act.[9]

---

[9] We therefore disagree with the Fifth Circuit's decision in United States v. Hollowell (In re Delta Food Processing), 446 F.2d 437 (5th Cir. 1971). In Delta Food Processing, the Fifth Circuit held that the bankruptcy court could enjoin the government from enforcing a lien against a debtor. The court reasoned that on equitable grounds, it is incongruous and unfair to allow the government to escape the provisions of the Chapter X stay. Id. at 438-39. We agree with the Fifth Circuit that allowing the government to escape stay provisions is unfair. Equitable concerns, however, cannot trump settled principles of sovereign immunity. See Ardestani v. INS, 112 S. Ct. 515, 521 (1991) (rejecting equitable argument made by petitioner, because it is up to Congress to specify

1.

The current Bankruptcy Code supports our holding that the government possesses sovereign immunity from the automatic stay provisions of Rules 401 and 601. In the Code, Congress expressly waived the government's sovereign immunity from, inter alia, injunctive relief and extended the waiver to the automatic stay provision, 11 U.S.C. § 362 (the successor to the various stay provisions under the Act and Rules 401 and 601). See 11 U.S.C. § 106(a) ("Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following: (1) Sections . . . 362 . . . of this title."). Congress explained that § 106(a) was "included to comply with the requirement in case law that an express waiver of sovereign immunity is required in order to be effective." S. Rep. No. 95-989, 95th Cong., 1st Sess. (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6440. Additionally, Congress expressly provided that the automatic stay provision in § 362 of the Code applies to "all entities" and defined "entity" to include a "governmental unit." 11 U.S.C. §§ 101(15), 362(a). In the legislative history, Congress explained that § 362 was "intended to be an express waiver of the sovereign immunity of the federal government."

waiver in the text of the statute); Hardy v. IRS (In re Hardy), 161 B.R. 320, 325 (Bankr. S.D. Ga. 1993) ("Equitable concerns are not relevant when deciding if immunity has been waived."), aff'd, 171 B.R. 912 (S.D. Ga. 1994). Under established immunity precedent, we can find waiver only if it is unequivocally expressed in the statutory text. Nordic Village, 503 U.S. at 33, 37. Applying Nordic Village to the Act, we reach a different result than the Fifth Circuit and respectfully disagree with Delta Food Processing.

S. Rep. No. 95-989, 95th Cong., 2d Sess. 51, <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787, 5837.

In contrast to the Code, the Act does not contain an express waiver of the government's

sovereign immunity with respect to the stay provisions of Rules 401 or 601.

2.

Moreover, we are unpersuaded by Murdock's assertion that under <u>Granfinanciera</u>,

the government waived its sovereign immunity from injunctive relief by filing a claim in

the bankruptcy court. Contrary to Murdock's assertions, <u>Granfinanciera</u> does not suggest

that the government waives its sovereign immunity when it submits a claim against a

bankrupt's estate because it subjects itself to the equitable jurisdiction of the bankruptcy

court. Indeed, <u>Granfinanciera</u>, did not involve governmental sovereign immunity.

Instead, <u>Granfinanciera</u> ruled that the Seventh Amendment entitles "a person who has not

submitted a claim against a bankruptcy estate" the right to a jury trial "when sued by the

trustee in bankruptcy to recover an allegedly fraudulent monetary transfer," but does not

entitle a creditor the right to a jury trial when he submits a claim against a bankrupt's

estate. <u>Granfinanciera</u>, 492 U.S. at 36. To accept Murdock's contention, we would have

to hold that the government's agents (Assistant United States Attorneys) waived the

government's immunity when they filed proofs of claim against Murdock's estate. This

holding would fly in the face of the well-established authority that "officers of the United

States possess no power through their actions to waive an immunity of the United States

or to confer jurisdiction on a court in the absence of some express provision of

22

Congress." New York Rayon, 329 U.S. at 660; see also Shaw, 309 U.S. at 499, 501-03; Associated Air Transport, 256 F.2d at 862. We do not believe Granfinanciera intended to establish such a clear break from settled immunity precedent, and we therefore reject Murdock's argument.

3.

We also reject Murdock's contention that Congress waived the government's sovereign immunity by granting the bankruptcy court jurisdiction to allow and disallow claims in § 2(a)(2) of the Act. There is no question that the bankruptcy court has jurisdiction to allow or disallow the government's claims. However, that does not mean that Congress has abrogated the government's defense of sovereign immunity. "The

issues are wholly distinct." <u>Blatchford</u>, 501 U.S. at 787 n.4.[10]

### III.

Accordingly, we conclude that the government possesses sovereign immunity from the automatic stays provided by Rules 401 and 601. Consequently, the government did not violate the automatic stays by terminating the Non-ASROC contracts. Because the bankruptcy court ruled the government violated the stay provisions of Rules 401 and 601, it did not address the applicability of the government contract law principles to the instant case. We therefore REVERSE and REMAND to the district court with instructions to remand to the bankruptcy court for the bankruptcy court to vacate its judgment and

---

[10] Murdock also asserts that if we hold the disputes clauses rendered the terminations final, it necessarily follows that the disputes clauses preempt Act § 57f and Rule 306, which permit the Trustee to file objections to claims and specify that "[o]bjections to claims shall be heard and determined as soon as the convenience of the court and the best interests of the estates and claimants will permit." We disagree. Our holding that the government retains its sovereign immunity from injunctive relief, and is therefore immune from the automatic stays of Rules 401 and 601 does not take away the Trustee's ability to object or the court's ability to hear the objections. Act § 57f and Rule 306 do not accord the Trustee the right to file a winning objection. In other words, our holding that the government retains its sovereign immunity means that the government may ultimately prevail because the Trustee failed to appeal the terminations of the Non-ASROC contracts within the thirty-day period under the disputes clauses of the Non-ASROC contracts. But that does not mean that the disputes clauses preempt § 57f or Rule 306.

24

conduct further proceedings consistent with this opinion.[11]

REVERSED AND REMANDED.

---

[11] We find no abuse of discretion in the bankruptcy court's ruling that laches does not bar the Trustee's objections to the government's claims. See, e.g., Park County Resource Council, Inc. v. United States Dept. of Agric., 817 F.2d 609, 617 (10th Cir. 1987) (court's decision regarding laches reviewed for abuse of discretion). We therefore affirm the bankruptcy court's decision on this issue.