**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 26 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

In re: GARY TALBOT and SHERRY
TALBOT,

        Debtors.

--------------------------------

UNITED STATES OF AMERICA,

        Appellant,

v.

BARBARA W. RICHMAN,

        Appellee.

No. 95-4130

---

Appeal from the United States District Court
for the Central District of Utah
(D.C. No. 94-CV-1044-G)

---

Laurie Snyder, Tax Division, Department of Justice, Washington, D.C. (Loretta C.
Argrett, Assistant Attorney General, Washington, D.C., and Gary D. Gray, Tax
Division, Department of Justice, Washington, D.C., Scott M. Matheson, Jr.,
United States Attorney, Of Counsel, on the brief), for Appellant.

Barbara W. Richman, Salt Lake City, Utah, (as and for Standing Chapter 13
Trustee for the Estate of Gary and Sherry Talbot, Debtors), for Appellee.

---

Before **BALDOCK, HOLLOWAY,** and **MURPHY,** Circuit Judges.

**MURPHY**, Circuit Judge.

## I.  INTRODUCTION

The United States appeals a district court order directing the Internal Revenue Service ("IRS") to disgorge monies paid to it by Chapter 13 debtors, Gary and Sherry Talbot.  The district court determined that a large payment made by the Talbots to the IRS for unpaid income taxes was improper because it was made outside of the confirmed plan of reorganization (the "Plan").  Exercising jurisdiction pursuant to 28 U.S.C. §§ 158(d) and 1291, this court **reverses** the order of disgorgement and **remands** to the district court for further proceedings.

## II.  BACKGROUND

On June 17, 1991, the Talbots petitioned the bankruptcy court for relief under Chapter 13 of the Bankruptcy Code (the "Code").  The IRS filed a proof of claim for pre-petition federal income taxes and interest in the aggregate amount of $37,660.  A sizable amount of the $37,660 owed by the Talbots to the IRS was properly secured through the filing of notices of tax lien which had previously

attached to the Talbots' home. According to the undisputed schedule of assets filed with the Talbots' petition, the home was worth $77,000. Using that undisputed valuation, the IRS asserted that $18,674[1] of its claim was secured. *See* 11 U.S.C. § 506(a) (providing that a claim secured by a lien on property is secured only to the extent "of the value of [the] creditor's interest in the estate's interest in [the] property"). The IRS also asserted that $15,875 of its claim was priority unsecured and that the remainder, $3111, was general unsecured. *See id.* § 507(a) (setting out priority of certain classes of unsecured claims).

In a proceeding brought pursuant to Chapter 13 of the Code, the debtor generally retains her assets and pays part of her future earnings to the trustee for distribution to creditors pursuant to a debt adjustment plan. *See generally* 8 *Collier on Bankruptcy* ¶ 1300.01-.02 (Lawrence P. King ed., 15th ed. 1996). Consistent with that scheme, the Talbots proposed a Plan under which creditors' claims, including the claims of the IRS, would be paid from the Talbots' future earnings. On February 4, 1992, the bankruptcy court ordered the Plan confirmed.

Under the Plan, the IRS retained its lien and the Talbots promised full payment of both the IRS' secured and priority unsecured claims, and at least

---

[1]The $18,674 represents the amount of the Talbots' equity after subtracting a mortgage and state tax lien from the undisputed value of the home.

thirty percent payment of IRS' general unsecured claim. Under the particular terms of the Plan, the Talbots were required to make monthly payments of $1060 to the Chapter 13 Trustee (the "Trustee") from their future earnings for a period of between thirty-six and sixty months. The Trustee would collect the payments, make distributions to creditors, and collect her own fee in accordance with the terms of the Plan.

In October 1993, some twenty months into the Plan, the Talbots sold their home for $137,500. This amount was substantially more than the $77,000 value placed on the home when the Talbots filed for Chapter 13 relief in June of 1991. By October of 1993, the federal taxes secured by liens against the Talbots' home had increased to $38,646. Of that amount, $19,229 represented unpaid debts relating to the Talbots' pre-petition taxes; the remaining $19,417 represented tax debts that had accrued post-petition. The IRS refused to release its lien on the residence unless the Talbots paid off their tax debts. Accordingly, the Talbots paid $38,646 to the IRS out of the proceeds of the sale of the home; the IRS, in turn, released the tax liens. By that time, the Talbots had already paid $11,703 of their pre-petition federal tax debt through payments under the Plan. The IRS then

filed amended proofs of claim in the bankruptcy proceeding reflecting the

$19,229 payment.[2]

After the sale of their home and payment to the IRS, the Talbots filed a

motion in the bankruptcy court to reduce the amount of their monthly payments

under the Plan from $1060 to $600 per month. The trustee objected "to the

portion of the debtors' motion which allowed the [IRS] to retain proceeds

received directly from the sale of debtors' real property, rather than provided for

the proceeds to be paid through the plan to [the IRS]." She asked the court to

order the IRS to disgorge and pay to her on behalf of the estate the $19,229 the

Talbots paid directly to the IRS from the sale proceeds of their residence. She

conceded that the IRS could keep the $19,417 it had received in satisfaction of

post-petition taxes. As support for her request, the trustee argued that the amount

the IRS could properly collect on its lien was limited to the balance remaining due

on its secured claim, which she contended was $6971.

The United States filed a memorandum in support of the Talbots' motion to

reduce their Plan payments. The United States argued that its tax lien survived

_____

[2]The amended proof of claim indicated that the IRS still held a $8888
priority tax claim and a $697 general unsecured claim. In light of the IRS's
amended proof of claim, it is clear at least part of the funds paid by the Talbots
were applied by the IRS to pre-petition taxes and penalties not provided for under
the Plan and were also used to pay down unsecured claims at a percentage higher
than that provided in the Plan.

the confirmation of the Plan and was not limited to the amount of the IRS's secured claim. The United States maintained that the only way in which a federal tax lien may be avoided is through an adversary proceeding. Because neither the trustee nor the Talbots brought an adversary proceeding to avoid the IRS lien, the United States asserted the lien continued to exist post-petition.

The bankruptcy court approved the Talbots' motion to modify the Plan. Nevertheless, by a separate order dated October 4, 1994, the court directed the IRS to disgorge $19,229 to the trustee so that the IRS's claim could be paid as provided in the Plan. The only rationale the bankruptcy court gave for its order was that the sale of Talbots' residence "had not been specifically approved by the Court."

On appeal to the district court, the United States again argued that the IRS tax lien survived confirmation of the Plan. In addition, the United States argued that the bankruptcy court should not have ordered disgorgement because the Talbots' home revested in the Talbots upon confirmation and was no longer property of the estate subject to bankruptcy court oversight. The district court affirmed the order of the bankruptcy court without opinion.

# III. ANALYSIS

A. Sovereign Immunity

The United States asserts for the first time on appeal that as a sovereign it was immune from the Trustee's suit in this case and, concomitantly, that the district court was without power to order the IRS to disgorge the monies paid to it by the Talbots. Although the general rule in the Tenth Circuit is that the court will not consider an issue raised for the first time on appeal, *Hicks v. Gates Rubber Co.*, 928 F.2d 966, 970 (10th Cir. 1991), the United States' claim of sovereign immunity presents an exception to the general rule.

"It has long been established . . . that the United States, as sovereign 'is immune from suit save as it consents to be sued.'" *United States v. Testan*, 424 U.S. 392, 399 (1976) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). "[T]he existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). "Thus, if the government has not consented to suit, the courts have no jurisdiction to either 'restrain the government from acting, or to compel it to act.'" *See United States v. Murdock Mach. & Eng'g Co.*, 81 F.3d 922, 930 (10th Cir. 1996) (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 704 (1949)). Furthermore,

neither the government's attorneys nor any other officer of the United States may waive the United States' sovereign immunity. *See Murdock Mach.*, 81 F.3d at 931. Accordingly, questions of sovereign immunity may be raised at any time in the proceeding. *See Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1539 (10th Cir. 1992); *Hicks*, 928 F.2d at 970; *Farmers Ins. Co. v. Hubbard*, 869 F.2d 565, 570 (10th Cir. 1989).

Substantively, the doctrine of sovereign immunity prohibits suits against the United States except in those instances in which it has specifically consented to be sued. *See Murdock Mach.*, 81 F.3d at 929. The United States consents to be sued only when Congress unequivocally expresses in statutory text its intention to waive the United States' sovereign immunity. *See United States v. Nordic Village, Inc.*, 503 U.S. 30, 33 (1992); *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95 (1990). Any waiver "must be construed strictly in favor of the sovereign and not enlarged beyond what [its] language requires." *See Nordic Village*, 503 U.S. at 34 (citations and quotations omitted).

Section 106(a) of the Code specifies the exact Code provisions for which the United States' sovereign immunity is waived. Section 106(a) provides, in pertinent part, as follows:

(a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit[3] to the extent set forth in this section with respect to the following:

(1) Sections 105, 106, . . . , 362, . . . , 1301, 1303, 1305, and 1327 of this title.

(2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.

11 U.S.C. § 106(a).

Although the parties have expended considerable energy debating the question of sovereign immunity, this court need not tarry on the issue. The resolution of this case depends on the resolution of the following two issues: (1) whether the Talbots' home remained property of the bankruptcy estate after the confirmation of the Plan or, instead, revested in the Talbots upon confirmation of the Plan; and (2) whether, by extracting the payment from the Talbots outside of the Plan before it would release its lien, the IRS obtained monies that it was not entitled to under the Plan. These questions can only be answered by reference to § 1327 of the Code. Because § 106(a) of the Code specifically waives the United States' sovereign immunity with respect to § 1327 and provides that a court "may

---

[3]According to the Code, "governmental unit means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States Trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government." 11 U.S.C. § 101(27).

hear and determine any issue arising with respect to the application of" § 1327 to the United States, the courts below had and this court has jurisdiction to reach the merits of this case. 11 U.S.C. § 106(a)(1) & (2).

B. The Bankruptcy Court's Disgorgement Order

"'In reviewing a district court's decision affirming the decision of a bankruptcy court, this court applies the same standards of review which governed the district court. The bankruptcy court's findings of fact will be rejected only if clearly erroneous. Its conclusions of law, however, are reviewed *de novo*." *Tulsa Energy, Inc. v. KPL Prod. Co. (In re Tulsa Energy, Inc.)*, 111 F.3d 88, 89 (10th Cir. 1997) (quoting *Broitman v. Kirkland (In re Kirkland)*, 86 F.3d 172, 174 (10th Cir. 1996)).

*1. 11 U.S.C. § 1327(b)*

The Trustee argues that the bankruptcy court's order of disgorgement was proper because the Talbots' house was property of the bankruptcy estate. *See* 11 U.S.C. § 362 (a) & (c) (setting out automatic stay and providing that it remains in effect at least until property is "no longer property of the estate"). The IRS, on the other hand, contends that the Talbots' house was not property of the estate and, accordingly, the bankruptcy court lacked the power to regulate the Talbots' disposition of the house. *See Black v. United States Postal Service (In re Heath)*, 115 F.3d 521, 524 (7th Cir. 1997) (holding that bankruptcy court is without

-10-

jurisdiction to control disposition of Chapter 13 debtor's property that is not property of the bankruptcy estate unless the property is related to the bankruptcy proceedings of the Code). The resolution of this issue depends upon an analysis of § 1327(b)[4] and the Plan.

The Trustee does not dispute that § 1327(b) generally effects a revesting of the property of the bankruptcy estate in debtors upon confirmation of a Chapter 13 plan of reorganization. She notes, however, that the automatic revesting provided in § 1327(b) is subject to a contrary result when "otherwise provided in the plan or the order confirming the plan." *Id.* According to the Trustee, the Talbots' Plan and the order confirming the Plan altered § 1327(b)'s automatic revesting scheme, with the Talbots' house remaining property of the bankruptcy estate and, therefore, subject to district court jurisdiction post-confirmation.[5]

---

[4]Section 1327(b) provides as follows: "Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor."

[5]This court notes that contrary to the assertions of the IRS and the acquiescence of the Trustee, it is not without question that the vesting provisions of § 1327(b) operate to grant absolute "ownership" of estate property to the debtor upon confirmation of a Chapter 13 plan. *See City of Chicago v. Fisher (In re Fisher)*, 203 B.R. 958, 960-962 (N.D. Ill. 1997) (setting out competing views of effect of § 1327(b)'s vesting provision, including view that § 1327(b) grants debtors something less than ownership); *In re Leavell*, 190 B.R. 536, 539-40 (Bankr. E.D. Va. 1995) (same). Nevertheless, because the Trustee does not contest the premise that § 1327(b)'s vesting provision operates to grant ownership rights, this court need not address the issue. Accordingly, the only issue before the court is whether the Talbots' Plan or the order confirming the Plan altered § 1327(b)'s default provision of revesting ownership of the Talbots' residence in

-11-

The Plan and the order confirming the Plan control the disposition of this issue. In addressing secured claims such as the claim secured by the IRS' lien, the Plan provides as follows:

> Each allowed secured creditor shall receive the fair market value of the collateral held by said creditor as indicated below. The balance of the claim due to said creditor shall become an unsecured claim. The discounted rate applied to the payment to be received by each creditor to compensate for any decrease in value of any personal property securing a claim shall be 10% of fair market value. Creditors may appear at the confirmation hearing and present testimony regarding the fair market value of their collateral. Each creditor shall retain its lien up to the fair market value of the collateral as determined by the Court.

The order confirming the Plan adds little, providing only that secured claimants retaining liens shall be paid the present value of their security. Neither the Plan nor the order confirming the Plan contain any language purporting to alter or delay the automatic vesting provisions of § 1327(b).

The Trustee's assertion that the above referenced Plan and confirmation order prevented the Talbots' residence from revesting after the confirmation of the Plan is based on a novel premise. According to the Trustee,

> Because the Talbots' plan and Order Confirming Plan provide that the IRS has an allowed claim secured by a duly perfected pre-petition tax lien, and provides for secured classification and treatment of the claim in compliance with 11 U.S.C. § 1325(a)(5)(B), including the retention of the lien to secure that portion of the IRS claim, then it is "otherwise provided" by the plan and the Order

the Talbots upon confirmation.

-12-

Confirming Plan pursuant to 11 U.S.C. § 1327(b) and the Talbots' property remains property of the estate until the secured claim is paid in full. The Trustee can bring matters before the court concerning the disposition of such estate property and the court is empowered to consider and rule upon proposed sales of such property.

Appellee Br. at 14. Thus, under the Trustee's view of the Plan and confirmation order, the mere reference to the lien retained by the IRS to protect the secured portion of its claim[6] serves to prevent the Talbots' residence from revesting in them pursuant to § 1327(b).

The Trustee reads far too much into the Plan and confirmation order. There is nothing in either document explicitly stating that the Talbots' residence will

_____

[6]Absent a provision in the Plan providing that the IRS would retain its lien on the Talbots' residence, the Plan was unconfirmable. Section 1325(a) of the Code provides as follows:

[T]he court shall confirm a plan if—
(5) with respect to each allowed secured claim provided for by the plan—
(A) the holder of such claim has accepted the plan;
(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
(C) the debtor surrenders the property securing such claim to such holder . . . .

Because the IRS did not accept the Plan and the Plan did not propose to surrender the residence to the IRS, the Plan could only be confirmed if it provided that the IRS would retain its lien.

remain in the bankruptcy estate after the confirmation of the Plan.[7] Furthermore,

the Trustee has not identified, and we could not find, a single case holding that a

plan provision in a Chapter 13 plan which provides for the retention of liens by

secured creditors pursuant to § 1325(a)(5) of the Code prevented the property

subject to the lien from revesting in the debtor upon confirmation of the debtor's

plan. *Cf. In re Habtemichael*, 190 B.R. 871, 873 (Bankr. W.D. Mo. 1996) (noting

that an automobile subject to a retained lien vested in the debtors upon

---

[7]It must be noted that the bankruptcy court's treatment of the payment by the Talbots to the IRS belies the Trustee's assertion that the residence remained in the bankruptcy estate upon confirmation of the Plan. As noted above, the IRS refused to release the lien on the Talbots house until the Talbots paid $38,646. Of that amount, $19, 417 was applied to the Talbots' post-petition liability for 1991 and 1992 taxes which were not part of the Plan obligations; the remaining $19,229 was applied to the tax obligations secured by the lien. When the Trustee learned of the payment, she sought an order of disgorgement only as to the $19,229 that had been applied to pre-petition tax obligations. The bankruptcy court entered an order of disgorgement, as requested by the Trustee, limited to the portion of the payment attributable to pre-petition tax obligations.

The facts set out above militate against the Trustee's argument, raised for the first time on appeal, that the house remained in the bankruptcy estate post-confirmation. If the house remained in the bankruptcy estate, all of the proceeds of the sale, not just those paid to the IRS on account of pre-petition debts, were property of the estate and, therefore, subject to turnover to the Trustee. When the Trustee limited its request for disgorgement to the monies applied to the pre-petition debts and the bankruptcy court limited its order of disgorgement to only that limited portion of the sale proceeds, each tacitly acknowledged that the house was not part of the estate and not subject to the unlimited jurisdiction of the bankruptcy court.

-14-

confirmation of plan or reorganization).  Finally, the Trustee's policy arguments

about the revesting of the residence in the Talbots are unconvincing.[8]

Because neither the Plan nor the order confirming the Plan provides

otherwise, the Talbots' residence revested in them upon confirmation of the Plan.

11 U.S.C. § 1327(b).  Accordingly, the bankruptcy court's order of disgorgement

cannot be affirmed on the ground that the residence was part of the bankruptcy

estate.[9]

---

[8]The Trustee appears to argue, although her brief is far from clear on this point, that allowing property secured by liens retained under a Chapter 13 plan to revest in debtor's pursuant to § 1327(b) places debtors in danger of overzealous post-confirmation collection efforts on the part of secured creditors.  The Trustee's concerns are overblown.  Property subject to retained liens need not remain in the bankruptcy estate to remain protected against collection activities of pre-petition creditors.  *See* 11 U.S.C. § 362(a)(5)& (c)(2).  Furthermore, to the extent that debtors, trustees, or creditors are concerned about meddling by secured creditors, potential problems of debtors managing property subject to retained liens, or abuse of the bankruptcy system by debtors, they are free to advocate that a plan defer § 1327 revesting until discharge.

[9]The Trustee argues in the alternative that even if the Talbots' residence was not property of the bankruptcy estate, the sales proceeds representing post-confirmation appreciation in value of the residence constitutes property of the estate pursuant to § 1306(a)(1) of the Code.  This is a dubious argument.  *See Black v. United States Postal Service (In re Heath)*, 115 F.3d 521, 524 (7th Cir. 1997) (holding that post-confirmation income that is not necessary to the fulfillment of the plan of reorganization does not become part of bankruptcy estate).  Because, however, the Trustee did not raise the issue below, the record is inadequate for this court to reach the merits of the Trustee's argument on appeal.  For instance, there is no indication in the record that the appreciation in the value of the residence occurred post-confirmation, rather than during the period between the Talbots' filing of their petition and the confirmation of the Plan.  Furthermore, the Trustee can point to no evidence in the record demonstrating that the IRS was paid out of that portion of the proceeds that might be attributable

*2. 11 U.S.C. § 1327(a)*

The Trustee argues that even if the Talbots' residence was not property of the estate, the bankruptcy court had jurisdiction to determine whether the payment extracted from the Talbots by the IRS in order to release the IRS lien violated the provisions of § 1327(a). *See* 11 U.S.C. § 106(a) (waiving the United States's sovereign immunity under § 1327). Section 1327(a) provides that "The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." Because the IRS extracted a larger payment than it was entitled to under the plan, the Trustee argues that the bankruptcy court acted properly in ordering the IRS to disgorge the payment.

"Upon becoming final, the order confirming a chapter 13 plan represents a binding determination of the rights and liabilities of the parties as ordained by the plan. Absent timely appeal, the confirmed plan is *res judicata* and its terms are not subject to collateral attack." 8 *Collier, supra*, ¶ 1327.02[1]; *Paul v. Monts*, 906 F.2d 1468, 1471 & n.3 (10th Cir. 1990) (noting under Chapter 11 provision

---

to post-confirmation appreciation in value, rather than to the portion attributable to the pre-confirmation value of the home. Accordingly, this court does not reach the merits of the Trustee's alternative contention. *See Dikeman v. National Educators, Inc.*, 81 F.3d 949, 954-55 (10th Cir. 1996).

analogous to § 1327(a) that a confirmed plan functions as a judgment). Furthermore, because "creditors are limited to those rights that they are afforded by the plan, they may not take actions to collect debts that are inconsistent with the method of payment provided for in the plan." 8 *Collier, supra*, ¶ 1327.02[1][b]; *see Habtemichael*, 190 B.R. at 874 (holding that a creditor's rights in a given case will "be totally extinguished upon payment of the sums called for in the order of confirmation"). Thus, the IRS was entitled to no more and the Talbots were obligated to pay no less than the amounts set out in the Plan and confirmation order.

In the instant case, the Plan and confirmation order clearly trifurcated the IRS' claim as follows: (1) a priority claim of $15,875; (2) a secured claim of $18,674; and (3) a general unsecured claim of $3,111. The Plan further provided that the IRS would retain its lien only to the extent of its secured claim. *See* Plan at 1-2 ("Each allowed secured creditor shall receive the fair market value of the collateral held by said creditor as indicated below. The balance of that claim due to said creditor shall become an unsecured claim. . . . Each creditor shall retain its lien up to the fair market value of the collateral as determined by the Court."). Accordingly, upon confirmation of the Plan, the IRS held a lien for the present value of $18,674. Upon payment of that sum, the IRS was obligated to release

its lien on the Talbots' residence. *See Habtemichael*, 190 B.R. at 874.[10] Thus, under the particular facts of this case and the provisions of the Plan, we conclude that the bankruptcy court had the power to order the IRS to disgorge all sums that it extracted from the Talbots in derogation of the Plan. This conclusion does not, however, mandate an affirmance of the bankruptcy court's order of disgorgement.

The Trustee argues as follows:

> The Order Confirming Plan in the Talbot case entitled IRS to be paid $18, 674.08 plus interest at 9% per annum for its claim secured by the Talbots' property. As reported to the Court, the Trustee had already disbursed $11, 702.83 in principal plus interest to the IRS, resulting in a secured claim balance of $6, 971.25. Based upon the effect of confirmation on the IRS claim, 11 U.S.C. § 1327, the maximum amount which should have been applied to the remaining tax liabilities secured by the lien of record was $6,971.25. The priority claim of $15, 875.02 and the general unsecured claim of $3,110.92 (of which the IRS was to receive 30%) were ordered to be paid through the confirmed plan and were not secured by the Talbots' property.

Appellee Br. at 7-8.

---

[10]The United States argues that to force it to release its lien upon the payment of its allowed secured claim would be to sanction "lien-stripping," an issue this court has yet to address. This court need not address the difficult issues surrounding lien-stripping in Chapter 13 because the United States failed to object to the treatment of its claim and the strip-down of its lien prior to the confirmation of the Plan. *See In re Szostek*, 886 F.2d 1405, 1413 (3d Cir. 1989) (secured creditor's failure to object to confirmation leaves the creditor bound by the provisions of the confirmed plan with respect to its rights as a secured claimant under § 1325(a)(5)); *In re Arkell*, 165 B.R. 432, 434 (Bankr. M.D. Tenn. 1994) (creditor's claim that "the extent of its security interest was improperly limited by the confirmation order had to be litigated before confirmation").

There are two basic flaws in the accounting advocated by the Trustee. First, even under the Trustee's accounting, the bankruptcy court's order of disgorgement cannot be wholly affirmed because at least some portion of the payment was properly paid to the IRS for the remainder of the lien. Absent payment in full on the secured claim, the IRS was not obligated to release its lien. Thus, to the extent some portion of the payment was properly credited to the IRS' secured claim, the bankruptcy court should not have ordered those funds disgorged. Second, and more important, the Trustee's accounting of plan payments is erroneous. The basic premise of the Trustee's accounting is that a large portion of the IRS' secured claim had been paid, leaving its priority and unsecured claims completely unpaid. Both the Plan and confirmation order, however, provide that allowed claims will be paid in the following order: administrative/attorney, priority, secured, unsecured. Accordingly, it is clear that at the time the Talbots made their payment to the IRS outside of the Plan, the entire secured claim of $18, 674.08 plus interest remained to be paid. Unfortunately, on the record before this court, it is unclear exactly how much the IRS was entitled to be paid before it was obligated to release its lien, and thus the amount, if any, the IRS was obligated to disgorge. Accordingly, this court reverses the bankruptcy court's order directing the IRS to disgorge the entire

-19-

$19,229.31 and remands the case to the district court to determine how much of

the $19,229.31 the IRS is entitled to retain under the principles set out above.[11]


## IV.  CONCLUSION

The order of disgorgement is hereby **REVERSED** and the case is

**REMANDED** to the district court for action in conformity with this opinion.

---

[11]In any event, the *res judicata* effect of § 1327(a) prohibits the IRS from extracting payments for penalties and interest not provided for under the confirmed Plan and prohibits the IRS from mandating payment of unsecured claims at a higher level than that set out in the Plan.  *See In re Habtemichael*, 190 B.R. 871, 874 (Bankr. W.D. Mo. 1996) (holding that a secured creditor "is not entitled to receive any more than that to which it was entitled pursuant to the terms of the confirmed plan").