**In re PRIMELINE SECURITIES CORPORATION, Debtor.**

No. 99–1429.
Adversary No. 98–5010.

United States District Court,
D. Kansas.

July 5, 2000.

Arthur S. Chalmers, Hite, Fanning & Honeyman L.L.P., Wichita, KS, for Debtor.

Kenneth J. Caputo, Washington, DC, for Appellant.

Alexander B. Mitchell, II, Klenda, Mitchell, Austerman & Zuercher, L.L.C., Wichita, KS, for Faruk Ahammed, Saeed Cheema, Geeta Choski, Mohammed Saiful Islam, Rabiul Karim, Saeed Mansouri, Mohammad H. Maih, Mohammed Farooq Mian, Mohammad Hasibur, Muhammad Sharifur Rahman, Mahendra A. Rathi, Subhash Shah, Shahid Uzzaman.

---

## MEMORANDUM AND ORDER

MARTEN, District Judge.

Linda S. Parks, Trustee for the liquidation of Primeline Securities Corp. ("Primeline"), and the Securities Investor Protection Corporation ("SIPC") appeal from the memorandum decision and judgment of the U.S. Bankruptcy Court for the District of Kansas dated October 6, 1999, finding that various claimants ("Claimants")[1] in the liquidation proceeding of Primeline were "customers" pursuant to the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. § 78aaa *et seq.*[2]

### I. Factual Background

At all times relevant hereto, Primeline was a licensed securities broker-dealer registered with the Securities Exchange Commission ("SEC") and the Kansas Securities Commission. Primeline was a member of SIPC. Primeline Financial Group, Inc. ("PFG"), was the holding company of Primeline, owning 100% of the stock of Primeline. PFG was not a member of SIPC. Primeline was an introducing broker on a fully disclosed basis. Primeline was not permitted to hold funds or securities for customers, and was not authorized to carry customer accounts. Because Primeline could not hold customer funds or customer securities, it was required to clear all securities purchases and sales for its clients through a clearing broker. Prior to November 1995, Primeline used Hanifen Imhoff, Inc., as its clearing broker. Beginning in November 1995, Rauscher Pierce Refsnes, Inc., became Primeline's clearing broker. Because Primeline was only an introducing broker, all investments through Primeline were to be made payable to Rauscher Pierce Refsnes, Inc.

Asif Ameen was a broker with Primeline at all relevant times through June 5, 1997. Ameen was not an officer or director of Primeline at any time. Ameen and all of the Claimants were from foreign countries, generally in South Asia. Among the South Asian community in Wichita, Ameen was known as someone who could be depended on to help with any problems that the Claimants encountered in the United States. He was very active in and around the South Asian student community in attendance at Wichita State University ("WSU"). Several of the Claimants stated

1. The Claimants include: Faruk Ahammed; Saeed Cheema; Geeta Choksi; Mohammed Saiful Islam; Rabiul Karim; Saeed Mansouri; Mohammad H. Miah; Muhammad Farooq Mian; Mohammad Hasibur Rahim; Muhammad Sharifur Rahman; Mahendra Rathi; Subhash Shah; and A.K.M. Shahid Uzzaman.

2. The Trustee and SIPC also appeal the Bankruptcy court's decision with regard to certain

cash payments made by the Claimants to Ameen. It appears to this court, however, that the Bankruptcy court addressed their arguments and ruled in their favor; *i.e.*, found that cash withdrawals, standing alone, were insufficient to prove the Claimants made investments with Ameen. Therefore, the court will not address this issue.

that Ameen had helped them find housing and complete the registration process at WSU. Ameen was also active in the South Asian professional community in Wichita. At social functions, Ameen was introduced to many of the Claimants as a person who would be able to help them with financial transactions, including establishing bank accounts and transferring funds by various means from South Asia, where stringent financial controls often restrict transfers of money to the United States.

Ameen was known as a person familiar with the stock market and investment opportunities in the United States who had been able to get other South Asians high rates of return on their investments. In essence, the Claimants were told that Ameen would take care of them. Because of their social acquaintance, his assistance to them at WSU, and his reputation for assisting others in the South Asian community, the Claimants trusted Ameen. Despite the fact that some of the Claimants were long-time residents of the United States and had professional degrees, they had either no experience or very limited experience with investments in the United States.

Ameen had many clients, including some of the Claimants, for whom he placed legitimate investments through Primeline and its clearing broker, Rauscher Pierce Refsnes, Inc. Although he conducted some legitimate financial transactions with his customers, he was also operating a Ponzi scheme [3] in which fictitious profits were paid to "investors" from principal sums deposited by subsequent investors.

The Claimants were all, in some way or another, involved in Ameen's scheme. Each claimant's situation is unique, but almost all of the claims fit a pattern. Ameen promised many of his clients an opportunity to "pool" their funds with other investors in order to make a higher rate of return than they could achieve with a single individual investment. Generally, Ameen met new or potential clients at Primeline's offices and gave them a Primeline "new client" information form. All of the Claimants testified that they believed that they were investing with, through, or in Primeline.

In conjunction with his scheme, Ameen and/or his wife, Gina Jacoby, maintained a number of individual bank accounts in various "company" or "trade" names, none of which were registered with the SEC pursuant to the Securities Act of 1933, nor were they related to Primeline or PFG. The "companies" included:

a) Ramesh Products Resources
b) William Control Co.
c) Cambras Communications Corp.
d) Discovery Distributing Corp.
e) Stateside Resources Corp.
f) Roxbury Corp.
g) Cobra Electronics Corp.
h) SST Marketing, Inc.
i) Brighton Information Services
j) Payfone Systems Corp.
k) Can Alaska Corp.
l) Epitope Discovery Systems
m) ELF Associates Corp.
n) World Tradelink

Ameen also had a company in which he did business by the name of Shipping Express King Copies, Inc. ("Shipping Express"). He controlled its bank account.

The Claimants' transactions with Ameen took a variety of forms. All of the Claimants followed Ameen's directions in delivering money to him. Many made checks out to one of Ameen's trade name accounts, and almost all of the funds involved

---

**3.** We have defined a Ponzi scheme as an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors.

*In re M & L Bus. Mach. Co.,* 84 F.3d 1330, 1332 n. 1 (10th Cir.1996).

in this appeal went into one of those accounts. Some of the Claimants made out checks to other Ameen investors, individually, at Ameen's direction. None of those checks went into the accounts of Primeline or its clearing broker. A number of Claimants asserted that they delivered cash to Ameen for investments.

Part of the allure of Ameen's scheme was the promised returns of approximately 7% to 10% per month. In some cases, Ameen either delivered account confirmation statements that were totally fraudulent or actually paid individual investors amounts reflecting the promised return. Many of the Claimants were then persuaded by Ameen to reinvest the proceeds. One claimant testified that he obtained cash advances on credit cards in order to invest with Ameen, hoping to finance his education on the difference between the finance charges on the credit cards and the higher rate of return promised by Ameen.

It appears that Ameen paid back some of the money to the Claimants directly. In a number of instances, Ameen issued the Claimants a Primeline form confirming the investment, even though the checks had not been made out to Primeline or its clearing broker.

Ameen's scheme eventually failed, due in part to the demands that some of the Claimants made on Ameen, Primeline and the Kansas Securities Commissioner. The Trustee has honored claims where the funds were actually delivered to Primeline and where the checks were made payable to "RPR" or "RPR Corp.," which Ameen deposited in his Ramesh Products Resources bank account at Southwest National Bank, rather than the bank account of Primeline's clearing broker, Rauscher Pierce Refsnes, Inc. The Trustee also has paid claims where Ameen transferred funds from an investor's RPR account to one of the accounts controlled by Ameen without the investor's authorization. However, the Trustee has refused to pay claims where the Claimants delivered checks to Ameen payable to entities other than "RPR" or "RPR Corp."

Claimants argue that they are entitled to payment of their claims against Primeline pursuant to SIPA. The Trustee and SIPC deny that the claims are covered by SIPA on the basis that the Claimants were not "customers" within the meaning of 15 U.S.C. § 78*lll* (2). The bankruptcy court determined that Claimants were "customers" within the meaning of § 78*lll* (2) and, thus, entitled to payment of their claims against Primeline. For the reasons set forth below, the decision of the bankruptcy court is reversed.

## II. Standard of Review

"The district court sits as an appellate court when an appeal is taken from the bankruptcy court." *United States v. Domme (In re Domme),* 163 B.R. 363, 365 (D.Kan.1994) (citing 28 U.S.C. § 1334(a)). On appeal, the district court may affirm, reverse or modify the bankruptcy court's rulings or remand the case with instructions for further proceedings. Fed. R. Bankr.P. 8013. Conclusions of law are reviewed de novo. *United States v. Richman (In re Talbot),* 124 F.3d 1201, 1206 (10th Cir.1997). However, this court is bound by the factual findings of the bankruptcy court unless such findings are clearly erroneous. *Securities Investor Protection Corp. v. Stellatos (In re Blinder, Robinson & Co.),* 124 F.3d 1238, 1241 (10th Cir.1997); *Richman,* 124 F.3d at 1206.

The court is called upon to determine whether the Claimants in this action are "customers" within the meaning of 15 U.S.C. § 78*lll* (2). In order to accomplish this task, the court must closely analyze the terms "customer" and "security," which are "statutorily defined term[s] of art as used in SIPA." *Securities Investor Protection Corp. v. Wise (In re Stalvey & Assocs., Inc.),* 750 F.2d 464, 468 (5th Cir. 1985). "The term[s][are] an integral part of a comprehensive statutory scheme governing the rights of creditors and bro-

kers." *Id.* "[I]nterpretations of such statutorily defined terms are a matter of law," subject to de novo review. *See id.* (and the cases cited therein).

## III. Discussion

 Because the Claimants seek preferred creditor status as "customers" under SIPA, which gives them priority in the distribution of assets liquidated by the Trustee and entitles them to advances from the SIPC fund, they bear the burden of proving that they fit within the statutory definition. *Mitchell v. Chicago Partnership Bd., Inc.,* 246 B.R. 854, 855 (N.D.Ill.2000). Section 78*lll* (2) provides in relevant part as follows: "The term 'customer' includes ... any person who has deposited cash with the debtor *for the purpose of purchasing securities.*" 15 U.S.C. § 78*lll* (2) (emphasis added). Courts have found that "customer" is a "term of art and its definition should be construed narrowly." *In re Omni Mut., Inc.,* 193 B.R. 678, 680 (S.D.N.Y.1996); *see also Mitchell,* 246 B.R. at 857.

The court concludes that the Claimants are not SIPA "customers" because the interests they attempted to purchase are not "securities" protected under the statute, which defines a "security" as:

> any note, stock, treasury stock, bond, debenture, evidence of indebtedness, any collateral trust certificate, preorganization certificate or subscription, transferable share, voting trust certificate, certificate of deposit, certificate of deposit for a security, any investment contract or certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or mineral royalty or lease (*if such investment contract or interest is the subject of a registration statement with the Commission pursuant to the provisions of the Securities Act of 1933 [15 U.S.C.A. § 77a et seq.]* ), any put, call, straddle, option, or privilege on any security, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase or sell any of the foregoing, and any other instrument commonly known as a security. Except as specifically provided above, the term "security" does not include any currency, or any commodity or related contract or futures contract, or any warrant or right to subscribe to or purchase or sell any of the foregoing.

15 U.S.C. § 78*lll* (14) (emphasis added).

The Claimants contend that the investments they made are protected under SIPA because they are "investment contracts." With regard to the Securities Act of 1933, the Supreme Court defined an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party." *Securities & Exch. Comm'n v. W.J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The Trustee and SIPC argue that the investments are not "investment contracts," because the Claimants expected to receive specified interest payments from their investments. According to them, receipt of specified *interest payments* is not the *apportionment of profits* as required under *Howey. See Resolution Trust Corp. v. Stone,* 998 F.2d 1534, 1540 (10th Cir.1993). They further argue that even if the investments are investment contracts, they are not "securities," because they are not registered with the SEC as required by the statute. The court will forego addressing whether the Claimants' investments were in fact investment contracts, because even if they were, they were not registered with the SEC; therefore, they were not "securities" as defined by SIPA.

SIPA's definition of security was patterned after the definition used in the Securities Acts of 1933 and 1934, except for one important distinction. *Mitchell*, 246 B.R. at 857. "Under SIPA, an investment contract constitutes a security *only* if it 'is the subject of a registration statement with the Commission pursuant to the provisions of the Securities Act of 1933.'" *Id.* (quoting 15 U.S.C. § 78*lll* (14)) (emphasis added). However, under the Securities Act of 1934, "an investment contract is a security *whether or not* it is the subject of a registration statement filed with the SEC." *Id.* (emphasis added).

While the new SIPA definition of "security" was modeled after that of the 1934 Securities Act, "[t]hat definition is not followed exactly ... since the purpose of the 1934 act and SIPA are different." S.Rep. No. 763, 95th Cong.2d Sess. 17 (1978), *reprinted in* 1978 U.S.C.C.A.N. 764, 780. As the legislative history explains of the SIPA definition: "Commodity contracts and options relating thereto are excluded, as are investment contracts, profit sharing plans, and an interest or participation in oil and gas leases which are not issued in a distribution pursuant to a registration statement filed with the Commission under the provisions of the Securities Act of 1933." *Id.* At a congressional hearing on the 1978 SIPA amendments, then-Chairman of the SIPC Hugh Owens discussed the drafters' intention to modify the 1934 definition of security in recognition of the fact "that a definition tailored to the purposes of the 1970 Act [rather than the enforcement and regulatory purposes of the 1934 act] is necessary," and said:

> [T]he proposed definition excludes investment contracts and oil and gas interests which are not registered with the Commission under the Securities Act of 1933 since we have concluded that, while it is important to have them included in a definition for enforcement purposes, *they are not the types of investments which should be protected by SIPC.*

> Hearing on H.R. 8331 Before the Subcomm. on Consumer Prot. and Fin. of House Comm. on Interstate and Foreign Commerce, 95th Cong., 1st Sess. 95–96 (Aug. 1, 1977) (statement of Hugh F. Owens, Chairman SIPC) (emphasis added).

*Id.* at 857.

It is unclear from the record exactly what the Claimants thought they were purchasing when they gave Ameen their checks payable to entities other than RPR. However, the Claimants argue that they were purchasing investment contracts. Because the alleged investment contracts were not registered with the SEC, as required by SIPA, they were not "securities" as defined by the statute. *See Mitchell,* 246 B.R. at 858 (finding investment in a limited partnership was not covered by SIPA because it was not registered with the SEC); *Omni Mut.,* 193 B.R. at 682 (same); *Securities Investor Protection Corp. v. Pepperdine Univ. (In re Brentwood Sec., Inc.),* 925 F.2d 325, 329 (9th Cir.1991) (same). Thus, the Claimants cannot qualify as "customers" entitled to protection under SIPA because they did not entrust their money to Primeline for the purpose of purchasing "securities."

The Claimants' subjective beliefs that the interests would be protected by SIPA, regardless of how reasonable those beliefs may have been, are not sufficient to find that Primeline held their cash or that they had purchased a 'security' as those terms are defined by SIPA. *Omni Mut.,* 193 B.R. at 682. "Under SIPA, '[a]rguments based solely on the equities are not, standing alone, persuasive.'" *Id.* (quotation omitted).

Every market has its dreamers and its crooks. Occasionally, they are one and the same. The SIPA protects investors when a broker holding their assets becomes insolvent. It does not comprehensively protect investors from the risk that some deals will go bad or

that some securities issuers will behave dishonestly. Claimants who cannot show that they entrusted their cash or securities to [the Debtor] have no remedy under the SIPA.

*Brentwood,* 925 F.2d at 330.

In conclusion, the court finds the Claimants have failed to meet the definition of "customers" with regard to the checks that were made payable to entities other than RPR and that alone is sufficient to preclude their recovery under SIPA. *Omni Mut.,* 193 B.R. at 682; *Brentwood,* 925 F.2d at 329.

IT IS THEREFORE ORDERED this 5th day of July 2000, that the order of the U.S. Bankruptcy Court entered on October 6, 1999, finding that the Claimants were customers entitled to protection under SIPA, is hereby reversed as set forth above.