**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SHARON BETHEL, individually and as
Conservator and Guardian of DAVID
BETHEL, an incapacitated person,

        Plaintiff – Appellee,

v.

UNITED STATES OF AMERICA,

        Defendant – Appellant.

No. 09-1219
(D.C. No. 1:05-CV-1336-RPM )
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, Chief Circuit Judge, **HAWKINS**, Senior Circuit Judge, and
**O'BRIEN**, Circuit Judge.[†]

---

David Bethel (David)[1] suffered severe brain damage while under anesthesia at the

Veterans Affairs Medical Center in Denver, Colorado (VAMC).[2] His wife, Sharon

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

[†] Honorable Michael Daly Hawkins, Senior Circuit Judge, United States Court of
Appeals for the Ninth Circuit, sitting by designation.

[1] For clarity and ease of reference, we use the Bethels' first names. No slight is
intended by our use of the familiar form.

[2] Appendix A contains a listing of all acronyms used in this Order and Judgment.

Bethel (Sharon), brought suit under the Federal Tort Claims Act (FTCA) against the United States and several doctors including Dr. Robin Slover, the lead anesthesiologist on David's case and an assistant professor of anesthesiology at the University of Colorado School of Medicine (UCSM). The case was originally assigned to the Honorable Phillip S. Figa. In resolving motions to dismiss, he concluded Slover was an employee of UCSM, an independent contractor, not an employee of VAMC, and therefore the federal government was not vicariously liable for her negligence under the FTCA. Subsequently, Judge Figa died and the case was reassigned to the Honorable Richard P. Matsch. Judge Matsch took a different course. He did not consider Slover to be a federal employee, but nevertheless decided the federal government was liable for her negligence. After a bench trial, he awarded damages in the amount of $10,710,700.

The government argues that under the FTCA it cannot be held vicariously liable for the negligence of someone other than its employee. It also claims Judge Matsch failed to consider legitimate defenses and failed to apportion fault among all negligent actors as required by Colorado law. We agree in part. Slover was not a federal employee at the time of David's injury so the government is not liable for her negligence. It was also error not to apportion fault among all relevant actors as required by Colorado law. However, we do not address the government's claimed defenses as they are best addressed in the first instance on remand.

# I. FACTUAL BACKGROUND

On September 10, 2003, David[3] reported to the VAMC for surgery to repair an anal fistula.[4] The surgery was to be performed by Dr. Frank Chae, a general surgeon, with the assistance of Dr. Joel Baumgartner, a first-year resident.[5] Slover was the lead anesthesiologist. Although employed by UCSM she was assigned to the VAMC pursuant to a contract between those entities which required UCSM to provide "4.32 full-time . . . anesthesiologists" to the VAMC. (Appellant's Appx. at 86.) Assisting Slover was Dr. Nicole McDermott, a first-year resident. The government admits McDermott was its employee at the time of this incident.

Prior to David's surgery, McDermott examined David's airway access, rating it a Level II or III (on a scale of I to IV with IV being the most difficult).[6] David was given the option of a spinal anesthesia (which would only numb the area of his body where the surgery was to be performed) but he chose to undergo general anesthesia. Once in the operating room, McDermott, apparently in Slover's presence, attached David to machines which monitored his vital signs and placed an oxygen mask on his face. It is unclear

---

[3] David, then age 40, weighed 275 pounds at 5'11" tall.

[4] "An anal fistula is a small tunnel (tract) with an internal opening in the anal canal and an external opening in the skin near the anus. It forms when an anal abscess that's drained (either on its own or via surgery) doesn't heal completely." *See* http://www.mayoclinic.org/anal-fistula/

[5] There is some indication in the limited record before us, *see infra* n.19, that Chae was working at the VAMC under a contract with UCSM and Baumgartner was a UCSM medical resident. Nevertheless, because they were not named as defendants in the amended complaint, their employment status is irrelevant to our decision.

[6] David was examined by a nurse practitioner the day before his surgery. She rated his airway access a Level IV.

what drugs were administered or by whom.[7] Slover left the room to attend to another patient, with the intent to proceed with the administration of the anesthesia when she returned.[8]

David became agitated, sat up and indicated he was having trouble breathing. McDermott and Baumgartner restrained him while a nurse paged Slover. When Slover returned, she performed a rapid sequence induction—simultaneously giving David the paralytic drug Rocuronium and other drugs to render him unconscious. Slover and McDermott then made several unsuccessful attempts to intubate David. Although no alarms sounded, the operating room nurse announced she could not detect a pulse. Slover, McDermott and Baumgartner immediately began resuscitation efforts and made an emergency call for assistance. Dr. Lyle Kirson, the VAMC's Chief Anesthesiologist, was among the first to respond. Using a two-handed jaw thrust, Kirson established an oral airway. David's heart began beating.

Dr. Chae arrived soon thereafter. After unsuccessfully seeking to establish an airway with a guidewire and tracheal tube, Chae, with the assistance of an Ear, Nose and

---

[7] He was allegedly given Midazolam (trade name Versed) for sedation, although at least one expert opined that he received, in error, the paralytic drug Rocuronium (trade name Zemuron) instead. Also, there is some indication in the record that David was given Midazolam prior to being taken to the operating room and that Slover left while David was being attached to the monitoring machines.

[8] In a normal (or non-rapid) induction, the anesthesiologist renders the patient unconscious by administering a drug. She then insures her ability to take over the patient's breathing. Once she is so satisfied the patient is given a paralytic drug to stop his breathing. The anesthesiologist then intubates the patient so a machine can breathe for him during the medical procedure.

- 4 -

Throat surgeon, performed a tracheotomy. David's vital signs improved and he was taken to the intensive care unit. As a result of the lack of oxygen and cardiac arrest, David suffered a hypoxic-ischemic brain injury. He was eventually released from the hospital in January 2004 with severe brain damage. He continues to have cognitive impairment and myoclonus;[9] he is unable to care for himself.

Normally a clinical record is made contemporaneously with the administration of anesthesia, noting the medications and fluids given to the patient and recording the patient's vital signs at regular intervals. Due to the emergency in this case, a contemporaneous record was not made. Slover and McDermott attempted to create a record later that day by retrieving data stored in the machines that monitored David's vital signs during the operation. The data could not be retrieved because the machines had been turned off. Slover, however, provided a written narrative report recounting the events.

## II.    PROCEDURAL BACKGROUND

Sharon, individually and as David's conservator and guardian, filed a medical malpractice case against the United States and Drs. Baumgartner, Chae, McDermott and Slover under the FTCA. Slover moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. She claimed she was an employee of UCSM, not the federal government, at the time of David's injury and therefore she was entitled to dismissal because Sharon failed to comply with the notice of

---

[9] "Myoclonus refers to sudden, brief, shocklike involuntary movements caused by muscle contractions or relaxations." *See* http://www.mayoclinic.org/myoclonus/

claim provision of the Colorado Governmental Immunity Act (CGIA).[10] *See* Colo. Rev. Stat. § 24-10-109.

The turning point in determining the critical issue, whether Slover was a federal employee or an employee of UCSM, is whether the government had the power to control the details of her work. Guided by the seven factors set forth in our case law to determine whether a physician is a federal employee, *see infra* Section III(A), Judge Figa concluded Slover was a UCSM employee and therefore the government was not liable for her actions under the FTCA. He also determined that, because Slover was a UCSM employee, Sharon's failure to comply with the CGIA's notice of claim provision warranted dismissal of the claims against Slover.[11] *See* Colo. Rev. Stat. § 24-10-109(a) ("Compliance with the [notice of claim] provisions . . . shall be a jurisdictional

---

[10] Sharon admits she failed to provide the UCSM's Board of Regents or the Colorado Attorney General with a written notice of claim prior to filing suit as required by the CGIA. *See* Colo. Rev. Stat. § 24-10-109. It was a considered choice. She decided not to pursue a claim against the UCSM, an entity of the State of Colorado, because any recovery would have been limited to a maximum of $150,000, which she believed would be wholly inadequate to compensate David for his injuries. *See* Colo. Rev. Stat. § 24-10-114(1)(a).

[11] Slover was sued in her individual capacity for medical negligence; neither UCSM nor the State of Colorado was named as a defendant. The CGIA provides immunity to public employees sued in tort for injuries arising out of "an act or omission of such employee which occurred or is alleged in the complaint to have occurred during the performance of his duties and within the scope of his employment, unless the act or omission causing such injury was willful and wanton." Colo. Rev. Stat. 24-10-118(1). It also requires, as a jurisdictional prerequisite, that any person seeking to sue a public employee, whether or not his actions are willful and wanton and whether or not he is being sued in his personal capacity, comply with its notice of claim provision. *See id.* § 24-10-118(1)(a); *see also Middleton v. Hartman*, 45 P.3d 721, 730 (Colo. 2002) ("[T]he plain language of the notice-of-claim provisions unambiguously requires notice in a suit against a state employee in which the plaintiff seeks to hold the state employee personally liable, as well as a suit where recovery is from the state.").

prerequisite to any action brought under the provisions of this article, and failure of compliance shall forever bar any such action."). The government subsequently designated Slover as a non-party at fault pursuant to Colo. Rev. Stat. § 13-21-111.5, alleging her malpractice caused David's brain injury.

With the court's permission, Sharon amended her complaint, naming the United States as the sole defendant and alleging the negligence of its employees, Kirson and McDermott, caused David's injuries. In the government's answer to the amended complaint, it admitted Kirson and McDermott were acting within the course and scope of their federal employment at the time of the operation and it was responsible under the FTCA for their conduct,[12] but denied their actions were negligent or the cause of David's injury. It also claimed Kirson's actions were reasonable under Colorado's sudden emergency doctrine, which states that an individual providing care in an emergency situation cannot reasonably be held to the same standard of care as one who had time for reflection, *i.e.*, one in a non-emergency situation. *See Young v. Clark*, 814 P.2d 364, 365 (Colo. 1991). And, to the extent McDermott was negligent, the government claimed Slover was liable for that negligence under the "captain of the ship" doctrine[13] because

---

[12] *See* 28 U.S.C. § 2679(d)(1) ("Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.").

[13] "The captain of the ship doctrine, which is grounded in respondeat superior principles, imposes vicarious liability on a surgeon for the negligence of hospital employees under his control and supervision during surgery." *Ochoa v. Vered*, 212 P.3d

- 7 -

Slover, as the attending anesthesiologist, was responsible for McDermott's actions.

After Judge Figa's death on January 5, 2008, the case was reassigned to Judge Matsch.[14] In a pretrial conference he reopened the issue of the government's vicarious liability for Slover's alleged negligence. After further briefing, he concluded the government could be held vicariously liable for Slover's conduct even though she was not a government employee. He based his decision on several factors: (1) UCSM and the VAMC shared "faculty and staff with joint appointments to staff to enable the [VAMC] to function as a major teaching facility" (Appellant's Appx. at 222); (2) Slover received her work assignments at the VAMC from Kirson (who the government admitted was its employee); (3) Slover, while working at the VAMC, supervised medical residents like McDermott (also a government employee); and 4) Slover was part of the VAMC's Medical Staff and the Staff Bylaws expressly stated: "Practioners appointed to the Medical Staff, while engaged in patient care activities . . . are covered under the [FTCA] for purposes of civil liability." (Appellant's Appx. at 223 (quotations omitted).)

A bench trial was held to determine liability. Despite the prior ruling holding the government vicariously liable for Dr. Slover's negligence at trial, the government attempted to show Slover was negligent and her negligence was the sole cause of David's

---

963, 966 (Colo. App. 2009). "[I]n a medical negligence case involving acts or omissions during surgery, the jury should be instructed that a surgeon is vicariously liable for the negligence of subordinate hospital employees from the time the surgeon assumes control of the operating room until the surgeon concludes the procedure." *Id.*

[14] Hereafter, references to the court or the judge refer to Judge Matsch unless otherwise stated.

injuries.[15] The court determined the government's legal position was "not tenable." (Appellant's Appx. at 243.) It also concluded it was not possible to apportion fault among the various doctors treating David because

> there was a systemic failure to prepare or preserve contemporaneous medical records and a failure to make an adequate investigation to reconstruct what happened when memories were sufficiently fresh to be reasonably reliable. The record keeping in this case was far below the standard of care of a hospital providing general anesthesia services.

(*Id.*)

Nevertheless, the judge concluded David's symptoms on the operating table were consistent with his having received the paralytic drug Rocuronium rather than Midazolam prescribed by Slover before she left the room. This medication error, he decided, was the precipitating cause of the chain of events that resulted in David's brain injury. However, it could not be determined whether McDermott put the wrong label on the syringe or whether Slover or McDermott used the wrong syringe. The judge also determined there was a treatment error in proceeding with a rapid sequence induction without an adequate

---

[15] Prior to Judge Matsch's ruling holding the government vicariously liable for Slover's alleged negligence, the government argued Slover's negligence caused David's injury. Even after Judge Matsch's ruling and in obvious disagreement with it, the government continued to "admit" Slover "breached the standard of care required for medical practitioners in the field of anesthesiology and that such conduct was the direct and proximate cause of the injury to David Bethel." (Appellant's Appx. at 233.) It said the following actions constituted a breach of the standard of care:

1. Slover failed to adequately assess [David's] condition after returning to the operating room, and she proceeded with a rapid sequence induction without first ensuring [his] airway could be secured safely.

2. Slover failed to promptly seek additional medical assistance in intubating or ventilating [David] when she should have been aware of the developing emergency.

assessment of David's condition. However, he concluded this error was not attributable to Slover alone because she was not present when David showed symptoms of the partially paralyzing effects of Rocuronium and McDermott failed to communicate that information to her.

The judge also relied on the expert opinion of Dr. Sheldon Deluty, a Board-certified anesthesiologist, who said Kirson breached the standard of care by failing to attempt ventilation with a laryngeal mask airway (LMA), a device inserted into a patient's pharynx to open his airway, as an alternative to intubation. While it was "speculat[ive]" as to whether use of the LMA would have been successful, the judge nevertheless believed that based on the published success rate, the use of an LMA may have revived the flow of oxygenated blood to David's brain much earlier and thereby reduced the amount of damage. (Appellant's Appx. at 246.) Ultimately, he concluded:

> The evidence is insufficient to apportion the injury to any one time or event. [David] did not have adequate oxygen in his blood or adequate circulation of his blood to his brain for a substantial amount of time as a result of negligent treatment by those responsible for his care at the []VAMC.

(*Id.* at 248.) He attributed all liability for David's injury to the government.

At the bench trial to determine damages, the parties stipulated to $300,000 in non-economic damages, $155,200 in past lost wages and $287,504.53 in future wage loss. While the Veterans Administration (VA) had provided and paid for all treatment and services David had required since his injury, the judge determined the "VA model of health care is not adequate for David," because it primarily responds to his symptoms rather than taking a proactive approach to his care. (Appellant's Appx. at 251.) He

concluded the government must fund a life care plan for David without requiring his family to provide services. The amount necessary to pay for future medical care and other health care expenses for the remainder of David's life (an estimated 29 years) was set at $12 million. While the total damages thus established were $12,742,704.00, judgment was entered for $10,710,700 because Sharon's FTCA notice of claim and its supplement sought only that amount. *See* 28 U.S.C. § 2675(b).

## III. DISCUSSION

According to the government, the district court erred as a matter of law in concluding it was liable for Slover's negligence—vicarious liability for Slover's negligence cannot lie because she was an employee of UCSM, not the federal government. It also contends there was no basis for imposing liability on it for David's brain injury because (1) Kirson acted reasonably in responding to the emergency created by Slover's negligence and (2) McDermott's negligence, if any, was attributable to Slover under the "captain of the ship" doctrine. Finally, it claims that even if there was negligence on the part of Kirson or McDermott for which it could be held responsible, the court failed, as Colorado law requires, to apportion liability among Kirson, McDermott and Slover.

A. Government's Liability for Slover's Negligence

Under the FTCA, the United States can be held liable for "personal injury or death caused by the negligent or wrongful act or omission *of any employee of the Government while acting within the scope of his office or employment*, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the

- 11 -

law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1) (emphasis added). "The [FTCA] is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813 (1976). "This unequivocal waiver of immunity must be construed narrowly and the limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Miller v. United States*, 463 F.3d 1122, 1123 (10th Cir. 2006) (quotations omitted). "Although 'employees' of the government include officers and employees of federal agencies, 'independent contractors' are not 'employees.'" *Tsosie v. United States*, 452 F.3d 1161, 1163 (10th Cir. 2006). Therefore, "[t]he FTCA does not authorize suits based on the acts of independent contractors or their employees." *Curry v. United States*, 97 F.3d 412, 414 (10th Cir. 1996) (citations omitted). Whether an individual is a government employee or an independent contractor is a question of law reviewed de novo. *Id.* We review the factual findings underlying the district court's decision for clear error. *Id.*

Whether an individual is a federal employee or an independent contractor for purposes of the FTCA turns on "whether the federal government has the power to control the detailed physical performance of the individual." *Duplan v. Harper*, 188 F.3d 1195, 1200 (10th Cir. 1999); *see also Orleans*, 425 U.S. at 814. "The key inquiry . . . is whether the Government supervises the day-to-day operations of the individual." *Lurch v. United States*, 719 F.2d 333, 337 (10th Cir. 1983). We consider:

(1) the intent of the parties; (2) whether the United States controls only the

- 12 -

end result or may also control the manner and method of reaching the result; (3) whether the person uses his own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

*Tsosie*, 452 F.3d at 1163-64.

Significantly, the district court never decided Slover was a federal government employee, but nevertheless concluded the government was vicariously liable for her conduct. That was error. The government can only be held liable under the FTCA for the negligence of its employees. *See* 28 U.S.C. § 1346(b)(1); *see also Orleans*, 425 U.S. at 813. Moreover, if the court actually or implicitly considered Slover a government employee, it erred. Considering the seven factors set forth above, as well as our case law (which the district court did not do), it is clear Slover was an employee of an independent contractor, not the federal government.

The intent of the VAMC and UCSM to establish an independent contractor relationship is plain from their contract. It refers to UCSM as "Contractor" and to the anesthesiologists rendering services under the contract as the "contractor's employee[s]." (Appellant's Appx. at 86.) It also provides: "The parties agree that Contractor personnel without formal VA appointments shall not be considered VA employees for any purpose and shall be considered employees of the contractor." (*Id.* at 90.) Additionally: "It is expressly agreed and understood that this is a non-personal services contract . . . under which the professional services rendered by the Contractor or its health-care providers *are rendered in its capacity as an independent contractor.*" (*Id.* at 98 (emphasis added).)

While the VAMC reserved the right to approve the assignment of personnel, UCSM, not the VAMC, selected the personnel to perform its responsibilities under the contract.

Turning to the second factor, the United States' ability to control the manner and method of Slover's performance, the contract states: "The Government may evaluate the quality of professional and administrative services provided but retains no control over [the] professional aspects of the services rendered, including by example, the Contractor's or its health-care providers' professional medical judgment, diagnosis, or specific medical treatments." (*Id.* at 99.) That provision weighs in favor of independent contractor status. However, the government's inability to control the medical judgment of contract anesthesiologists flows not only from the contract but also the professional ethical obligations of the doctors, which require they be given complete discretion in the care of patients. *Lilly v. Fieldstone*, 876 F.2d 857, 858-59 (10th Cir. 1989). These ethical obligations foreclose a strict control test in determining whether a physician is a government employee. *Id.* at 859. Instead, we must "determine whether other evidence manifests an intent to make the professional an employee subject to other forms of control which are permissible." *Id.* The express language of the contract identifying UCSM as an independent contractor coupled with the lack of evidence manifesting an intent to create an employee relationship tip the second factor in favor of independent contractor status.

With respect to the fourth and fifth factors, UCSM is required by the contract to include the contract anesthesiologists in its workers' compensation plan and to withhold income and social security taxes from their pay. The contract also reads: "The Contractor

and its health-care providers shall be liable for their liability-producing acts or omissions. The Contractor shall maintain or require all health-care providers performing under this contract to maintain . . . professional liability insurance . . . ." (Appellant's Appx. at 98-99.) These matters weigh heavily in favor of Slover being an employee of UCSM, an independent contractor.

The last two factors likewise point to independent contractor status. Sharon has pointed to no regulations prohibiting federal employees from performing contracts like this one and she conceded Slover could also subcontract to others.

Only one factor weighs against independent contractor status—Slover does not use her own equipment when rendering services under the contract but instead uses the VAMC's equipment. However, we have recognized: "When a physician shows up to work in today's world—either as an independent contractor or a full-fledged employee—he no longer is likely to carry all relevant medical instruments in a black satchel. Instead, it is expected that he will make full use of the hospital's physical facilities during the course of his service." *Tsosie*, 452 F.3d at 1164. This factor, even if relevant, is not determinative.

Applying the seven-factor test leads to only one conclusion—Slover is the employee of an independent contractor and not a federal government employee. Other case law is consistent with our conclusion. *See, e.g., Tsosie,* 452 F.3d at 1164 (holding emergency room doctor at government-owned hospital was an independent contractor under the seven-factor test because (1) the doctor was working at the hospital pursuant to a contract between the government and Medical Doctor Associates (MDA), (2) the

- 15 -

contract clearly said the services rendered by the doctors were to be rendered as independent contractors and (3) MDA provided its doctors with liability insurance and paid their social security taxes); *Duplan*, 188 F.3d at 1200 (concluding doctor at Air Force clinic was not a government employee but rather the employee of Med-National who contracted with the government to provide medical services at the clinic because (1) the contract between Med-National and the government stated Med-National was responsible for selecting, assigning, transferring, supervising and controlling the contract doctors; (2) Med-National paid the doctor; and (3) the doctor was to obtain his own liability insurance); *Lurch*, 719 F.2d at 338 (concluding neurosurgeon who performed services at VA hospital pursuant to a contract between the hospital and the University of New Mexico was an employee of an independent contractor where (1) University had discretion to choose which physicians would fulfill its contractual obligations; (2) the contract expressly said doctors providing services under the contract "shall not be considered VA employees for any purpose," and (3) the University provided the contract doctors with workers' compensation, insurance, and social security payments).

The factors relied upon by the district court do not adequately support its contrary conclusion. Kirson, a government employee, managed Slover's work assignments and Slover supervised government employees. But UCSM assigned Slover to the VAMC and Kirson could not override Slover's professional judgment. In any event, the fact that an individual receives his work assignments from a government employee and supervises government employees are not factors we have identified as relevant in determining whether one is a government employee for purposes of the FTCA. As the government

- 16 -

correctly argues, an independent contractor generally receives his work assignments from the contracting party. Moreover, the supervision, assistance and support of VAMC staff, as well as the training of medical residents and students, are services the government expressly contracted for from UCMS.

Slover was required by the contract between the VAMC and UCSM to be credentialed and privileged according to VA policies. Such requirements, however, do not defeat independent contractor status. *See Lurch*, 719 F.2d at 338 n.9 ("General regulation of activities [does] not . . . avoid the independent contractor exemption from FTCA liability."). In *Lurch*, we concluded the following factors (similar to the facts here) "amount[ed] to no more than pervasive regulation of [the doctor] by the VA hospital": the doctor (1) could not refuse to see a VA patient, (2) was required to be present at all VA neurological clinics, (3) could be terminated by the VA hospital, and (4) had to conform to the VA's rules and regulations. *Id.* In *Lilly*, we rejected a physician's contention that he was a government employee because he was subject to the same rules, regulations and hospital control as other military physicians: "Surely, being subject to [a] hospital's rules as a condition of staff privileges does *not* remotely make a private physician an employee of that hospital." 876 F.2d at 860.

And, in *Duplan*, we overruled the district court's reliance on the following facts as grounds for concluding the physician was a government employee: the government (1) had the power to conduct periodic quality reviews of his performance, (2) imposed minimum standards for doctors hired to perform services under its contract with Med-National with respect to education, licensing, work experience and general health, and (3)

- 17 -

required the physician to abide by a dress code and to follow government-established rules, policies and procedures in treating patients at the hospital. We reasoned:

> [T]he government's ability to require that contract doctors meet minimum qualifications and to conduct reviews of the contract doctors' performance amounts to nothing more than a standard quality assurance [provision] by which the government reserves the right to determine whether it is satisfied with the services it is purchasing under the contract.

> There was no evidence showing that the [hospital]'s regulations . . . diminished [the physician's] control over the choices he made in fulfilling his duties . . . . Likewise, that [the physician] was subject to the government's rules as a condition of working at the [hospital] does not indicate that he was an employee of the government.

188 F.3d at 1201 (citation and quotations omitted).

The district court relied heavily on the VAMC's Medical Staff Bylaws which provide that practitioners appointed to the Medical Staff, while engaged in patient care activities, are covered under the FTCA for purposes of civil liability. The government contends this statement in the Bylaws refers only to <u>formal appointments</u> by the VA under statute and it says Slover was not <u>formally</u> appointed to the VA. However, the Bylaws define "Appointment" as "an appointment to the Medical Staff. It does not refer to appointment as a Veterans Administration employee . . . . *Both Veterans Health Administration employees and contractors* may receive appointments to the Medical Staff." (Appellee's Supp. Appx. at 18 (emphasis added).) Slover was a member of the Medical Staff. Nevertheless, the contract between the VAMC and UCSM provides: "The parties agree that Contractor personnel *without formal* VA appointments shall not be considered VA employees for any purpose and shall be considered employees of the contractor." (Appellant's Appx. at 90 (emphasis added).) Here, although Slover was

privileged and credentialed to work at the VAMC and a member of its Medical Staff, it does not appear she was <u>formally</u> appointed to the VA because a "formal" appointment apparently refers to a statutory appointment under 38 U.S.C. § 7401 and § 7405. Under those statutes, the Secretary of Veteran Affairs is authorized to "employ" medical personnel and refers to this employment as "appointments."[16]

But that is beside the point. The VAMC Bylaws cannot waive the federal government's sovereign immunity. *See United States v. Murdock Mach. & Eng'g Co. of Utah*, 81 F.3d 922, 930-31 (10th Cir. 1996) ("The government consents to be sued only when Congress unequivocally expresses its intention to waive the government's sovereign immunity in the statutory text . . . . Because waiver must be unequivocally expressed by Congress, officers of the United States possess no power through their actions to waive an immunity of the United States or to confer jurisdiction on a court.") (quotation marks and citations omitted).

Slover was not a federal employee. The federal government cannot be held liable for her negligence under the FTCA. The district court erred in concluding otherwise.

B.  Sudden Emergency and "Captain of the Ship" Doctrines

The government argues that to the extent the district court determined Kirson and

---

[16] Several courts have held that those appointed under § 7405 are federal employees, not independent contractors. *See, e.g., Ezekiel v. Michel*, 66 F.3d 894, 900 (7th Cir. 1995) (the "statutory scheme . . . clearly establishes that [the defendant] was a federal employee rather than an independent contractor"); *see also Carrillo v. United States*, 5 F.3d 1302, 1305 (9th Cir. 1993) ("Under the statute, appointed staff members . . . are considered government "personnel" and in most cases they are paid by the government."). There is no indication the Secretary "appointed" Slover pursuant to statute.

McDermott were negligent, it erred as Kirson's actions were reasonable under Colorado's Sudden Emergency Doctrine and any negligence on the part of McDermott was attributable to Slover under the "captain of the ship" doctrine.[17]

Sharon argues the Sudden Emergency Doctrine does not relieve a physician of liability or lessen the standard of care. Rather, the fact a physician was responding to an emergency is just one factor to be considered in determining whether he acted reasonably. She says the district court concluded that a reasonably careful physician would have used an LMA under the same or similar circumstances encountered by Kirson. As to the "captain of the ship" doctrine, Sharon contends it applies to the negligence of those under a <u>surgeon's</u> supervision and control. She says no authority

_____

[17] As stated previously, the "captain of the ship" doctrine is based on respondeat superior principles. *See supra* n.13. "The doctrine of respondeat superior provides that an employer may be held vicariously liable for an employee's torts when the act is committed within the course and scope of employment." *Colo. Comp. Ins. Auth. v. Jones*, 131 P.3d 1074, 1079-80 (Colo. App. 2005). "The additional liability of the employer, however, does not shield the negligent employee from his own personal liability, nor does it supplant his liability with that of his employer. It provides only an alternative, and in some cases a more lucrative, source from which the injured party may recover his damages." *Shannon v. City of Milwaukee*, 289 N.W.2d 564, 568 (Wis. 1980); *see also Arnold ex rel. Valle v. Colo. State Hosp., Dept. of Insts.*, 910 P.2d 104, 107 (Colo. App. 1995) ("An employer's liability for an employee's negligence based upon *respondeat superior* is only a secondary liability."). Therefore, the fact Slover may be responsible for McDermott's negligence under the "captain of the ship" doctrine does not necessarily relieve McDermott from her own negligence.

There is an added wrinkle in this case. The government has admitted McDermott was acting within the scope of her employment at the time of David's injury. Therefore, under the FTCA, the government has assumed responsibility for her negligence, if any. *See* 28 U.S.C. § 2679(d)(1). Consequently, application of the "captain of the ship" doctrine may not necessarily let the government off the hook. We leave resolution of these issues to the district court on remand.

- 20 -

exists for the proposition that an <u>anesthesiologist</u> may be held liable for the acts and omissions of others in the operating room. Even assuming the doctrine could be applied to an anesthesiologist, Sharon says it does not relieve the government of liability because Kirson, a government employee, was undisputedly the anesthesiologist in charge.

The district court did not specifically address the Sudden Emergency Doctrine. And it refused to consider the "captain of the ship" doctrine after concluding the government was vicariously liable for Slover's negligence.[18] Since we reverse on vicarious liability and because the record on appeal is incomplete, these issues should be addressed in the first instance on remand.[19]

_____

[18] Sharon says the government waived this argument by withdrawing it. But it is clear from the record the only reason the government withdrew it as a defense was because the district court directed it to do so based on its erroneous ruling that the government could be held vicariously liable for Slover's negligence.

[19] The parties did not provide us with a complete trial transcript. The only trial testimony provided is that of Dr. Sheldon Deluty, whose expert opinion the court relied upon to conclude Kirson was negligent in failing to attempt ventilation with an LMA. In addition to criticizing Kirson for failing to use an LMA, Deluty opined David's behavior on the operating room table was consistent with him having received Rocuronium rather than Midazolam and it was McDermott's responsibility to fill and properly label the syringes. He also testified McDermott was responsible for fully informing Slover of David's behavior upon her return to the operating room and if she did not, McDermott breached the standard of care. Deluty further testified that the standard of care in 2003 required the anesthesiologist to complete an anesthesia clinical record contemporaneous with the administration of anesthesia. When a contemporaneous record cannot be made, the anesthesiologist should complete it later by retrieving the data stored in the memory of the machines monitoring the patient's vital signs. In this case, Deluty testified it was McDermott's duty to ensure the data was retrieved from the machines before it was lost. And McDermott could be found to have breached the standard of care even though she was only a first-year resident. On cross-examination, however, Deluty admitted he did not critique Slover's actions because he was only asked to review Kirson and McDermott's conduct. He also conceded Slover had a duty to ask McDermott what had transpired in her absence and had Slover not proceeded with a rapid sequence induction

C.  Apportionment of Fault

The government complains that even if Slover was not solely negligent for David's injuries, the district court erred in not apportioning fault between Slover and the government employees, McDermott and Kirson.  It says the court's determination that it could not apportion fault due to faulty recordkeeping is not supported by the record because there was a large amount of evidence and testimony concerning the incident that was available to the court, including a five-page report prepared by the VAMC two weeks after the incident and a peer review by a University of California professor of anesthesiology six months after the accident.  The government also argues that even if the records kept during this emergency were imperfect, that did not excuse the district court from apportioning fault as Colorado law requires.

As part of its tort reform, "the Colorado legislature eliminated joint and several liability wherein one tortfeasor might be liable in damages for the acts of another tortfeasor, and adopted a several liability scheme, wherein a tortfeasor is responsible only for the portion of the damages that he or she caused."  *Slack v. Farmers Ins. Exch.*, 5 P.3d 280, 284 (Colo. 2000).  In particular, Colo. Rev. Stat. § 13-21-111.5 states in relevant part:

> (1) In an action brought as a result of a death or an injury to person or property, *no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant* that produced the claimed injury, death, damage, or loss . . . .

upon her return to the operating room, David "would not be in the condition that he's in today."  (Appellee's Supp. Appx. at 245.)

- 22 -

(2) The jury shall return a special verdict, or, in the absence of a jury, *the court shall make special findings determining the percentage of negligence or fault attributable to each of the parties and any persons not parties to the action* . . . to whom some negligence or fault is found and determining the total amount of damages sustained by each claimant. The entry of judgment shall be made by the court based on the special findings, and no general verdict shall be returned by the jury.

(Emphasis added.)

Clearly, the trier of fact is <u>obliged</u> to apportion fault. Here, the district court suggested there was negligence on the part of Slover and/or McDermott and Kirson. Nevertheless, because it believed the federal government was responsible for the negligence of all three of these individuals, it did not apportion fault among them. As it now stands, the federal government cannot be held liable for Slover's negligence so fault must be apportioned.

While it may be extremely difficult to apportion fault in this case, it is not impossible. The anesthesia clinical record was incomplete because the machine recording David's vital signs was turned off prior to obtaining its data, and the syringes used to administer the various drugs to David were not saved or tested. But, as the court concluded, none of these actions were intentional. And, as the government correctly points out, Slover did complete a medical report of the incident on September 10 and 11, 2003; the VAMC performed an immediate investigation of the incident and prepared a report of that investigation; and an independent review of the incident was conducted by a Professor of Clinical Anesthesia at the University of California within seven months of the incident. The court also had the assistance of several experts, as well as the testimony

- 23 -

of the relevant actors.[20]

Sharon agrees that if we conclude Slover is not a federal government employee under the FTCA, the government is entitled to apportionment as a private defendant under Colorado law. However, she says that in order for the district court to have apportioned fault, the government was required to plead and prove not only that Slover was at fault but also that her fault caused David's injuries. Sharon claims the government did not meet its burden. That is a matter for the district court on remand.

## IV.    CONCLUSION

The federal government is not liable for Slover's actions. The district court's contrary judgment is reversed. On remand, it must apportion fault (if any) between Slover and the federal government employees (Kirson and McDermott).

**REVERSED AND REMANDED**. The government's motion to file a supplemental appendix is **GRANTED**.

> **Entered by the Court:**
>
> **Terrence L. O'Brien**
> United States Circuit Judge

---

[20] The district court noted the testimony was made several years after the incident "when memories had already faded." (Appellant's Appx. at 243.) Unfortunately, that is true in a great number of cases. While the passage of time can certainly complicate the truth-seeking process, it does not excuse the duty of the trier of fact to apportion fault as it is best able.

- 24 -

**APPENDIX A**

List of Acronyms Used Throughout the Order and Judgment

1. VAMC: Veterans Affairs Medical Center (VAMC)

2. FTCA: Federal Tort Claims Act

3. UCSM: University of Colorado School of Medicine

4. CGIA: Colorado Governmental Immunity Act

5. LMA: Laryngeal Mask Airway

6. VA: Veterans Administration

7. MDA: Medical Doctor Associates